**L. C. BROWN, Appellant,**

v.

**COMMONWEALTH of Kentucky, Appellee.**

Court of Appeals of Kentucky.

Nov. 23, 1960.

Wm. R. Forester, Barbourville, for appellant.

John B. Breckinridge, Atty. Gen., Ray Corns, Asst. Atty. Gen., for appellee.

STEWART, Judge.

Appellant, L. C. Brown, was jointly indicted with James T. Hobbs for the wilful murder of John D. Carnes, a 76-year-old man. Appellant moved for a severance, was tried separately in November, 1959, found guilty of voluntary manslaughter, and sentenced to 21 years and a day in the penitentiary. On this appeal Brown urges a reversal on two grounds: (1) He was entitled to a directed verdict; and (2) the court failed to instruct the jury on the whole law of the case.

Carnes was killed at his home on the left fork of Turkey Creek in Knox County on Sunday, June 28, 1959, between 10:00 and 10:30 a. m. Appellant, who is married to the sister of his co-defendant, Hobbs, then lived in a tenant house owned by Carnes and located from 200 to 225 yards above the creek and to the left of the Carnes residence. Appellant had made his home at this location for more than 18 months and was on good terms with Carnes up until the time of the latter's death.

Appellant and his witnesses gave this account of his activities on Saturday, June 27th, and on Sunday, June 28, 1959:

Appellant borrowed his father's green 1948 Oldsmobile in the afternoon of the Saturday mentioned and drove to the home of one Lizzie Mills on Straight Creek in Bell County, a distance of approximately 30 miles from where he lived. He arrived in the late afternoon on Saturday, stayed with Lizzie Mills that night and did not depart until 11:00 or 11:30 on Sunday morning. On Saturday night a party got into full swing at the Mills home at which much drinking and carousing took place, and this lasted until practically dawn. At about 12:30 a. m. Sunday morning Hobbs appeared on the scene and remained until about 2:30 a. m. when he was sent back to appellant's home for more whiskey; but Hobbs did not return. Appellant and Lizzie Mills left her home on Sunday morning, went down Straight Creek to see her son for 30 or 40 minutes, and then on to visit her mother for a short time.

When appellant finally set forth from Straight Creek he traveled first to the home of Hobbs, where he undertook to locate him, and afterwards he returned toward Turkey Creek. He left his car at one Lester Broughton's and walked from the latter's house up the creek toward his residence. Before he came to his home and when he was 200 yards below the place where Carnes lived, appellant met Hobbs coming from the

opposite direction. We quote this excerpt from his testimony in this connection: "He was bloody as could be, had a white shirt on and his whole shirt was bloody and his hand was bloody and looked like to me on his left hand was a cut place and he said 'If you tell this, I'll kill you.' I said 'I won't tell it.' And that is all the man said and I went on home."

Appellant reached his home about 12:00 or 12:30 o'clock, found his family was unharmed, and then began to suspect that Carnes had become a victim of foul play at the hands of Hobbs. However, recalling the threat Hobbs had made earlier, he was at first afraid to go to the Carnes house to check up on the situation. He ate a quick lunch and then drove to his father's house 10 miles away to return the car. He stayed there until about 4:30 p. m. and was driven home by his brother. He next got his mule and watered him. Then he decided to go down the creek and let the animal graze on the grass in Carnes' yard. When he arrived at his destination he caught sight of Carnes' hat on the floor of the porch and "hollered" for him. Receiving no answer and suspecting there had been bloodshed, he went for some of his neighbors, a quarter of a mile away. Several men came back with him, entered the house and found Carnes lying in a pool of blood, showing signs of having been beaten to death. Appellant then drove a neighbor's truck to Barbourville and got the sheriff, the undertaker and the coroner.

On the next day, appellant told the sheriff that Hobbs had committed the crime. The sheriff, observing spots on appellant's overalls (which later proved to be discolorations made by tobacco juice) and thinking they were blood stains, arrested appellant. (One mark on appellant's shirttail, approximately one-fourth of an inch square, turned out to be blood, but it was never determined to be the same type as Carnes'.) On this same day Hobbs was arrested in Clay County. He had in his possession a shotgun belonging to Carnes and was wearing crepe sole shoes, similar to the ones that had made tracks which were found in the blood on the floor of the Carnes house.

After his arrest, Hobbs made a statement which tended to implicate appellant with Carnes' death. This is a summary of what he told the peace officers:

On Sunday morning, about 10:00 o'clock, he went by appellant's home, the latter having not yet arrived from Straight Creek, and then began his journey out of Turkey Creek hollow. Presently he drew up in front of the Carnes home, noticed Carnes sitting on the porch and went up to offer him a drink of moonshine whiskey. Hobbs himself had been drinking heavily and was, as he expressed it, feeling "tight." Shortly thereafter Carnes requested Hobbs to accompany him into the house and there he opened his trunk presumably to show Hobbs a paper of some description. Suddenly and without warning, Carnes struck out with a reap hook and cut Hobbs' hand. Hobbs retaliated by striking him once with a "crock" (which turned out to be a granite pitcher) and twice with his fists, all three blows landing on the head and face. Hobbs next shoved Carnes, whose nose was bleeding freely, on to a bed in the room and then went out to the porch.

When he got outside he saw appellant standing at the well 20 or 30 feet away and Hobbs walked out and talked to him. Soon Hobbs began to feel sick, returned to the porch and lay down. About this time Carnes appeared on the porch and approached Hobbs. At this juncture, according to Hobbs' testimony, "* * * somebody else hit the porch and started dragging the old man, I don't know who it was and the next thing I heard, why I raised up and he was dragging him through the door but I don't know who was dragging him. I didn't see him in the face and don't know who it was." Carnes gave out one scream and Hobbs passed out. When he recovered consciousness "two or three hours later" he found Carnes dead and the house was torn up.

The body was in a different room from the one where Hobbs and Carnes had

fought. He went through all the rooms, took Carnes' shotgun and left. He proceeded to his car, put the shotgun in the trunk, searched for his keys which were missing from his pocket, and thinking that appellant had taken them from him while he was unconscious, started back to appellant's home. On the way he met appellant, who gave him the keys when requested to do so. Hobbs mentioned that Carnes was dead. Appellant replied: " 'I told you it was going to happen,' " and " 'don't go to the law nor nobody when you go out of here. Go straight and don't go to the law or nothing.' " And " 'if you go to the law, if I don't kill you Daddy or Fred will.' " Hobbs then went home and his wife burned his bloody clothes.

The foregoing summary of evidence constitutes the factual background of this case as it bears upon the guilt or innocence of appellant. Other facts will be given hereinafter when it becomes necessary to develop other material aspects of this case.

■ Appellant insists that the evidence produced against him, which was wholly circumstantial in its nature, was inadequate to sustain his conviction. We agree. The case of Baird v. Commonwealth, 241 Ky. 795, 45 S.W.2d 466, 468, had this to say where guilt is sought to be established entirely by circumstantial evidence: "A conviction may be had upon circumstantial evidence, but the circumstances shown must be so unequivocal and incriminating in character as to exclude every reasonable hypothesis of the innocence of the accused." This language on the same point appears in Mullins v. Commonwealth, 196 Ky. 687, 245 S.W. 285, 286: "The rule that a conviction in a criminal case may be had upon circumstantial evidence alone is subject to the qualification that, if the evidence be as consistent with defendant's innocence as with his guilt, it is insufficient to support the conviction."

The Commonwealth argues that other proof in this case tends to place appellant at or near the scene of the crime when it was consummated and, in addition, to establish a motive upon his part for its commission. Ed Valentine and his wife, Lilly, who were neighbors of appellant and of John D. Carnes and who appeared as witnesses in behalf of the Commonwealth, stated they saw appellant in the Turkey Creek hollow, "coming away from the location where" John D. Carnes lived, in a neighbor's green pickup truck at 9:30 a. m. on Sunday, which was about one-half hour to an hour before Carnes' murder. The other testimony is a statement of Hobbs' wife, a Commonwealth witness, who testified she heard appellant comment on several occasions that Carnes had some money hid in his home and he, appellant, "was going to get it."

It is extremely difficult to rationalize the testimony of the Valentines with that of James T. Hobbs. According to the latter's testimony, they could not have seen appellant come out of the hollow from the direction of the Carnes' house around 9:30 a. m. on the morning of the killing, driving a green pickup truck. Hobbs' evidence is uncontradicted on the point that his car got stuck in a mud hole in the only road that leads up the Turkey Creek hollow, and stayed mired there from dawn or earlier until 8:30 or 9:00 a. m.; that after his car was extracted from the place it had bogged down, he proceeded up this road to appellant's home, arriving there at approximately 10:00 a. m.; that he then went on to the Carnes residence; and that he did not see appellant until after he had fought with Carnes. Since there were only the two houses in the hollow, Carnes' and appellant's, and since Hobbs was in close proximity to these houses until 10:30 a. m., he could not have missed seeing appellant that morning had he been travelling on the only road that leads out of the hollow or had he been in that vicinity. It should also be added that the Valentines were the only ones who testified they observed appellant on that occasion in a "green pickup truck," whereas everyone else who testified on the subject never saw appellant in any motor vehicle except a green Oldsmobile car.

Nor can we give much weight to the remark of Hobbs' wife when she undertook in her testimony to link appellant with the slaying of Carnes by attributing to him a design to rob his neighbor. At most, her statement, if taken literally, implies that appellant disclosed an intention to commit merely an act of theft. Certainly murder, or even violence, may not be inferred from such language.

When we consider the evidence as it relates to appellant's behavior and movements, from the beginning to the end of the period under discussion, certain uncontradicted facts are significant which would appear to exonerate him from blame in respect to the murder of Carnes. He was the first to investigate the felonious act and report it to the sheriff. He was also arrested as a suspect because this law enforcement officer saw what he thought were blood stains on his clothes, but these dark spots on analysis turned out to be made by tobacco juice. His house was searched with his consent and nothing of an incriminating nature was located therein. His relations with Carnes had been uniformly friendly up to the day of Carnes' death. When Hobbs observed him at Carnes' house standing calmly by the well appellant exhibited no heat of passion, no trace of malice, no indication whatsoever that he intended to perpetrate an act of bloody murder a few moments later. Indeed Hobbs in testifying seemed careful to avoid saying that appellant was the person who "hit the porch" and the one who "started dragging the old man" toward the inside; in fact, he reiterated three times that he did not "know who it was."

On the other hand, strong proof was introduced to the effect that Hobbs alone and unassisted murdered Carnes. One could believe a motive to extinguish the life of Carnes was established by his sister, Viola Brown, the wife of appellant. She testified that on the day of the homicide, Hobbs, at her house, stated that he had seen "the old man" (meaning Carnes) with a mandolin and he was going to get

it if he had to knock his head in with it and if there was any money in the house he would find it. On the Monday Hobbs was arrested, he had on his person $25 which he claimed was the balance left from $40 he had received from the sale of his car that same day. However, he still had possession of the car when he was taken into custody, having driven it to Clay County to his place of employment in a mine; and it was further brought out that on that same Monday morning he had spent other sums in the purchase of white-wall tires and a sun visor for the automobile. By his own admission he beat Carnes with his fists and with a granite pitcher; he searched Carnes' home after the struggle; and he took a shotgun from the house. It was also proven that only his shoe tracks (he was wearing shoes with crepe soles) were found in the blood at or near Carnes' body.

It is our view the conviction of appellant is rested entirely on suspicion, surmise and supposition. Where a conviction is had upon circumstantial evidence, "the evidence must be of such character that it may not be reconciled with the presumption of innocence that attends every accused person, and must possess such force as to exclude every reasonable hypothesis of the defendant's innocence." See Moore v. Commonwealth, 223 Ky. 128, 3 S.W.2d 190, 191. We conclude the evidence in the case at bar was as consistent with appellant's innocence as with his guilt, with the result that it will not uphold his conviction. Therefore, under the facts shown in this case and the law applicable thereto, it was the duty of the trial judge to instruct the jury peremptorily to find appellant not guilty.

The opinion we have reached makes it unnecessary to consider the second ground advanced for reversal of the judgment.

Wherefore, the judgment is reversed and the case is remanded with directions that if at another trial the evidence be substantially the same the circuit judge will direct the jury to find appellant not guilty.