Winfred Eugene **LAMBERT**, Appellant,

v.

**COMMONWEALTH of Kentucky**, Appellee.

Court of Appeals of Kentucky.

Jan. 31, 1964.

Rehearing Denied April 17, 1964.

E. Lawson King, Lexington, for appellant.

John B. Breckinridge, Atty. Gen., David Murrell, Asst. Atty. Gen., for appellee.

MOREMEN, Judge.

Appellant, Eugene Lambert, was indicted for murder, found guilty of voluntary manslaughter, and sentenced to twenty-one years' imprisonment. Instructions were given on murder, voluntary manslaughter, self-defense, reasonable doubt as to guilt, and reasonable doubt as to the degree of the offense.

Appellant contends that the trial court committed reversible error by failing to submit to the jury an instruction on involuntary manslaughter under KRS 435.022 which became effective a few days before the alleged offense occurred.

The propriety of the instructions can be tested only by the evidence adduced below which is substantially as follows. About three o'clock in the afternoon Lambert was arrested for the offense of being drunk in a public place and was taken to the Lexington city jail. He was placed in a cell block. It appears that the doors to the various cells were open and the prisoners were free

to move about in the entire area. Also incarcerated was Andrew Smith. In about two hours after Lambert was put in jail, he became involved in a fracas with Smith over cigarettes, but the first threat of violence seems to have come from Smith when he threatened to cut off appellant's head. According to appellant's version of the encounter he made every effort to avoid the controversy and walked away from Smith to the other end of the cell block, but when he arrived there he found that Smith had followed him and continued his threats to cut him. He stated that he begged others to help and that things quieted down for a few minutes. He retreated even further to the shower room, but Smith followed and again repeated his threats. Then Smith approached the appellant and cut him with a knife. The cut seems to have been severe. It extended from a point below his ear to the edge of his lips. He bled copiously. He said he became dizzy and felt as though he were about to "pass out" and that he had to grab the bars to hold himself up. He started to the front of the jail in order to get help from the guard. Although he had to pass Smith's cell to get there, he believed that Smith was not going to bother him anymore because "he had already done his job." When he went past Smith's cell, Smith came out and said he was going to finish cutting his head off and started toward him. As to what then occurred, Lambert stated:

"He started towards me and whenever he got close enough I remember hitting him, and I hit him, I think he hit the bars here or something, and I did kick him. I remember that much of it. From that point on I don't remember anything until I was at the hospital getting sewed up. I turned my head around like that, and there was a nurse turned my head around, said 'we have just got about three more stitches to put in, turn your head around,'"

The Commonwealth produced, among other witnesses, Arthur Begley who had been in the city jail at the time of the encounter and who witnessed the original scuffle between the two men. He was not sure who was the aggressor at that time, but he did say that Smith cut appellant with a knife. He stated that afterwards they were all walking back and forth along the walkway and Smith was standing in the doorway of the cell when Lambert walked by. He does not know who started the second argument, but he saw this:

"Well, Mr. Lambert knocked this Smith down and he fell, and he kicked him, his head hit the bars and I don't know whether it knocked him out right then or not, but he kicked him several times and he was knocked out."

On further examination the witness stated that Lambert for a time kicked and "stomped" Smith.

A police officer testified that he saw Lambert kick Smith. There was also testimony that he kicked Smith again when the police were loading him into the ambulance outside the jail.

Prior to the enactment of KRS 435.022, which became effective June 14, 1962, this state did not have a statute that defined the crime of involuntary manslaughter, and neither did it have a specific statute that fixed the punishment for the offense. The general statute (KRS 431.075), which provided penalties for common law offenses not otherwise provided by statute, applied. Therefore, for the common law offense of involuntary manslaughter a person could be imprisoned in the county jail for a term not exceeding twelve months or fined a sum not exceeding five thousand dollars or both; in short, involuntary manslaughter was a misdemeanor. The question as to when an involuntary manslaughter instruction should be given has caused considerable discussion in the opinions. Generally the conclusion has been that each case must be judged upon its individual facts. In Maulding v. Commonwealth, 172 Ky. 370, 189 S. W. 251, where the facts were such that

there was little doubt that the accused intended to kill his victim, this was said:

"In this case there is no question made that Maulding did not kill Nickols, and the undisputed facts show that he beat and bruised and mashed his head and face in such a brutal and horrible manner as to leave no room to doubt that he did intend to kill him. Under these circumstances it would be travesty on justice for this court to say that an instruction should have been given, telling the jury that they might punish Maulding by a mere fine and imprisonment if they believed he did not intend to kill Nickols.

"We can, of course, well understand how a case might arise in which an instruction on the subject of involuntary manslaughter should be given. We can easily suppose a case in which a man might, in a fit of anger, strike another with his fist, or kick him without any intention of killing him, although the man struck or kicked might die from the effects of the blow. In such a state of case, if the facts and surrounding circumstances reasonably showed a lack of intention to kill, an instruction on the subject of involuntary manslaughter would be proper. * * * But where the killing is done in such manner and under such circumstances as to exclude the idea that it was not intended to kill, the crime falls under the definition of murder or of voluntary manslaughter, as the case may be, and no instruction on the subject of involuntary manslaughter should be given."

█ Under the circumstances of this case—where, according to appellant's theory of the case, there was extreme aggravation, where appellant was suffering from the effects of alcohol, where he was cut and bleeding and in a state of shock— we are of opinion that an instruction on involuntary manslaughter, even under the law as it existed before the new statute, was

necessary. The new statute, which for the first time divides involuntary manslaughter into two degrees of the crime and makes the first degree a felony, requires some comment. The statute (KRS 435.022) provides:

"(1) Any person who causes the death of a human being by an act creating such extreme risk of death or great bodily injury as to manifest a wanton indifference to the value of human life according to the standard of conduct of a reasonable man under the circumstances shall be guilty of involuntary manslaughter in the first degree and shall be confined in the penitentiary for not less than one nor more than fifteen years.

"(2) Any person who causes the death of a human being by reckless conduct according to the standard of conduct of a reasonable man under the circumstances shall be guilty of involuntary manslaughter in the second degree and shall be imprisoned in the county jail for a term not exceeding twelve months or fined a sum not exceeding five thousand dollars or both."

Formerly, in connection with "negligent" manslaughter where the action of the accused was such that his conduct might properly be designated as being wanton or reckless, it has been held that such conduct was sufficient to require an instruction on voluntary manslaughter. From the very nature of the act was presumed the intent to kill. The intent to kill was the gravamen of the offense which could be deduced from the acts of the accused or founded upon his reckless or wanton disregard for the safety of human life. Kearns v. Commonwealth, 243 Ky. 745, 49 S.W.2d 1009.

As we have said, the words "wanton" and "reckless" have been used to define conduct which could result in a conviction of *voluntary* manslaughter. This new statute now uses these same words to define involuntary manslaughter.

This seemingly hopeless contradiction is explicable. The words "wanton" and "reckless" were used in connection with a narrow line of voluntary manslaughter cases—those in which an element of negligence was present. An example is Marye v. Commonwealth, Ky., 240 S.W.2d 852. In that case the general statement was made

"It is our view that instructions in voluntary manslaughter cases should require a finding of reckless and wanton conduct, and instructions in involuntary manslaughter cases should require a finding of gross negligence in order to authorize a conviction."

That statement was not true as a general rule. It was applicable only to the "negligent voluntary manslaughter," a crime which Professor Roy Moreland has long attacked as "impossible" because of its contradiction in terms.

Doubtless the intention of the drafters of the new involuntary manslaughter statute was to abolish this "impossible" crime and to replace it with the crime of first degree involuntary manslaughter. Therefore, there is no longer any need to use the words "reckless" and "wanton" to describe the crime of voluntary manslaughter and they shall be used exclusively in defining involuntary manslaughter.

The words do not have a generally accepted and clear-cut meaning. Some indication of their vagueness may be found in the fact that in "Words and Phrases," about seventy-two pages are necessary to summarize the cases dealing with the definitions of "wanton"; "reckless" consumes about forty-six pages. It is plain from the wording of KRS 435.022 that the legislature had in mind two degrees of punishment for separate and distinct acts: one was made felony, and the other misdemeanor. We are required, therefore, to give definitions for two words as used in this statute. A wanton act is a wrongful act done on purpose in complete disregard of the rights of others. The actor must have conscious knowledge of the probable consequences and a complete disregard for them. Reckless conduct displays an indifference to the rights of others and an indifference as to whether wrong or injury will result from the act done. Recklessness involves thoughtlessness while wanton conduct involves actual knowledge of the probable result and complete disregard for those results.

Under the evidence and appellant's theory of defense, he was entitled to instructions on both phases of involuntary manslaughter.

Judgment reversed.