Parker HEMPHILL, Appellant,

v.

COMMONWEALTH of Kentucky, Appellee.

Court of Appeals of Kentucky.

May 15, 1964.

C. B. Upton, Williamsburg, for appellant.

Robert Matthews, Atty. Gen., F. E. Wood, Asst. Atty. Gen., Frankfort, Carlos B. Pope, Commonwealth's Atty., Barbourville, for appellee.

DAVIS, Commissioner.

Parker Hemphill was convicted of voluntary manslaughter by the Knox Circuit Court for the slaying of Jim Smith, a police officer of Barbourville. He appeals, seeking reversal of the conviction and consequent sentence of 21 years' imprisonment.

Appellant submits five separate grounds for reversal. It is our conclusion that the judgment must be reversed for error in the court's instructions to the jury, hence, we omit a list of other claimed errors.

The homicide occurred in the front yard of appellant's residence in Barbourville about 10 p. m. in July, 1962. The prosecution's evidence showed that Jim Smith, victim of the homicide, was then on duty as a police officer of Barbourville, and was in the company of his fellow officer Mays. Mays testified that as he passed the appellant's home he was hailed by appellant's 74-year-old mother from her wheelchair on the porch of the residence. Mays responded to Mrs. Hemphill's cries, and was asked by her to go into the residence to see what appellant had done toward "tearing up the house." At that

time the victim Smith was not present. Mays entered the home and found appellant, who asked whether Mays had a warrant.

Mays responded that he had no warrant and was not there to arrest appellant. The witness said that he observed Nancy Hampton [1] sweeping dishes, glass and food that had been broken on the floor. Meanwhile, Jim Smith had come into the house; appellant then latched the screen door to the porch and told his mother she would have to stay out. Then Mays unlatched the screen, walked onto the porch and was followed there by Smith. Mays swore that appellant "got kindly mad about the screen being unlatched."

Mrs. Hemphill then said to Mays, "Don't leave me. If you do, he will kill me." (In her testimony, Mrs. Hemphill denied this.) The officers explained to Mrs. Hemphill that they could not arrest appellant without a warrant; Smith went next door to telephone the county judge *pro tem* with a view to obtaining a warrant for appellant's arrest. Mays said that appellant's mother warned that appellant had a shotgun, but Mays reassured her that appellant "don't want to hurt nobody."

Just then Mays heard the back door slam and then two shotgun blasts in the back yard. Nancy Hampton came to the front door and inquired, "You reckon he shot my car up?" At this Mays started around the right side of the house to the back yard, when Jim Smith came running out of the next door house and "hollered" at Mays. Thereupon Mays, followed by Smith, went back across the Hemphill yard, at which time appellant came from the end of the porch with a shotgun. Mays testified that appellant held the gun on him and told Mays he would shoot out his guts. Mays pleaded with appellant, suggesting they were friends, and that appellant would get in trouble if he fulfilled his threat. Appellant agreed, "cussing."

Smith had come closer by then, and appellant told Mays to get in the police cruiser and leave, but then turned to Smith and said, "You can't ride. You are going to have to walk." Smith then turned toward appellant, but said nothing, at which appellant shot Smith in the groin. Appellant and Smith "was right up against each other" then, said Mays. Smith's pistol was still in the holster when appellant shot him, then Smith drew the weapon and fired all of the six shots from it, and appellant was wounded in six places. Mays withdrew to a point behind the cruiser and fired his revolver four times, but it is not known whether any of his shots struck appellant.

Mays said that appellant shot at him twice, but neither shot hit him. Appellant and Smith grappled after Smith was shot, and they fell to the ground together. Smith died a few minutes later.

Appellant's version of the tragedy is quite at variance with Mays' account. He testified that Smith ran toward him with his pistol drawn, while appellant had the shotgun in a nonoffensive position—that Smith's first shot struck the shotgun and appellant—that appellant was knocked to the ground, and that the shotgun was accidentally discharged as the result of this. Appellant denied that he had fired the shotgun twice, or at all, in the back yard. He made a vague reference indicating that he may have fired the shotgun while lying on the ground, and after the shotgun had been discharged accidentally, "trying to get away from them."

Some neighbors testified to facts indicating Smith was attempting to disarm appellant. Appellant's mother acknowledged that she had requested the officers to take the gun from appellant, not because she feared he would hurt anyone, but because she felt this would prevent appellant's going to his farm that night.

1. Nancy Hampton, a friend of appellant, was there to look after appellant's mother; there is contrariety in evidence whether she was to spend the night.

By Instruction 1, the trial court submitted the questions of willful murder and voluntary manslaughter, substantially as set out in § 868, Stanley's Instructions to Juries.

Instructions 2 and 3, as given by the trial court, also are patterned precisely from the second and third instructions set out in § 868, Stanley's Instructions to Juries.

■ The third instruction was the usual self-defense instruction. If the evidence on a new trial is substantially the same as in the instant trial, the self-defense instruction should be qualified to reflect that appellant may not avail himself of self-defense if appellant brought on the difficulty. See § 897, Stanley's Instructions to Juries, and collected cases therein.

The fourth instruction given by the court is as follows:

"4. Although the jury may believe from the evidence beyond a reasonable doubt that the defendant shot and killed deceased with a gun, as in Instruction No. 1, described, if they believe from the evidence that he committed the act without previous malice, but shall believe from the evidence beyond a reasonable doubt that such shooting and killing was unlawfully and wilfully done by defendant in a sudden affray or in sudden heat and passion and with felonious intent to kill deceased, or shall believe from the evidence beyond a reasonable doubt that the shooting and killing of deceased, if done by defendant, was the direct and natural, though unintentional result of a reckless, wanton or grossly careless use or handling, if any of said gun by defendant in struggling with deceased for its possession, when he knew it was dangerous to life if so handled by him, they should find him guilty of voluntary manslaughter, and fix his punishment at confinement in the penitentiary for not less than two nor more than twenty-one years."

It would appear that the genesis for the quoted instruction may have been § 883, Stanley's Instructions to Juries. It is observed, however, that the form as contained in § 883, op. cit., was published before the effective date of KRS 435.022. That statute became effective June 14, 1962, approximately one month before the instant homicide. By the terms of KRS 435.022 the crime of involuntary manslaughter is separated into two degrees; the first degree is a felony in which the range of punishment is confinement in the penitentiary from one to fifteen years. The second degree of the offense is a misdemeanor for which the punishment may be imprisonment in the county jail not longer than twelve months, or a fine not exceeding five thousand dollars, or both.

■■ There is no statute in this jurisdiction defining the common law offense of voluntary manslaughter, but KRS 435.020 prescribes penalty of not less than two nor more than twenty-one years in the penitentiary for one convicted of the crime. Prior to the enactment of KRS 435.022 our cases classified homicides resulting from wanton or reckless conduct as voluntary manslaughter. See Lambert v. Commonwealth, Ky., 377 S.W.2d 76, and Combs v. Commonwealth, Ky., 378 S.W.2d 626, and cases therein discussed. It is our view that KRS 435.022 specifically removes from the framework of voluntary manslaughter those homicides resulting from negligence; therefore, the new statute makes inapplicable the cases equating negligent homicide with voluntary manslaughter, no matter how gross the negligence. It follows that the quoted Instruction No. 4 was erroneous in classifying negligent homicide within the crime of voluntary manslaughter punishable by imprisonment of 2 to 21 years.

■ Instruction No. 4 also was erroneous, and confusing, in that it resubmitted

the common law offense of voluntary manslaughter, which already had been fully covered in Instruction No. 1. Upon another trial of the case, if the evidence is substantially the same as on the first trial, the court will give the first three instructions as submitted on the first trial (subject to the qualification of the self-defense instruction), but Instruction No. 4 will be as follows:

4(a)  If the jury believe from the evidence, beyond a reasonable doubt that in Knox County, Kentucky, and before the finding of the indictment herein, the defendant shot and killed James Smith with a shotgun, and that such shooting occurred by reason of any act or acts of the defendant creating such extreme risk of death or great bodily injury to the said James Smith as to manifest defendant's wanton indifference to the value of human life according to the standard of conduct of a reasonable man under the circumstances, then you should find the defendant guilty of involuntary manslaughter in the first degree, and fix his punishment at confinement in the penitentiary for not less than one nor more than fifteen years, in your discretion.

A wanton act, as used in this Instruction, is a wrongful act done on purpose in complete disregard of the rights of others, with conscious knowledge of and complete disregard for the probable consequences.

4(b)  If the jury believe beyond a reasonable doubt that the defendant shot and killed James Smith, as described in Instruction 4(a), and that such shooting was the result of conduct of the defendant, reckless according to the standard of conduct of a reasonable man under the circumstances, then you should find the defendant guilty of involuntary manslaughter in the second degree, and fix his punishment at confinement in the county jail for a term not exceeding twelve months, or by fine not exceeding five thousand dollars, or by both such fine and imprisonment, in your discretion.

Reckless conduct, as used in this Instruction, is conduct done with indifference to the rights of others, and indifference whether wrong or injury will result from the act done.

Instruction No. 5, as given on the first trial, was more favorable to the defendant than warranted by law. If the evidence of another trial warrants any instruction on accidental shooting, it should follow the form set out as numbered paragraph 3, § 883, Stanley's Instructions to Juries.

█ Upon another trial the court will modify Instruction No. 6, as given on the first trial, so as to include involuntary manslaughter in the first and second degrees among the list of offenses for which a verdict may be returned.

We do not reach the question whether error was committed in obtaining jurors from an adjoining county. Upon another trial the court will be guided by KRS 29.-262 and RCr 9.33, and make a fair effort in good faith to obtain an unbiased jury from Knox County citizens before obtaining veniremen from an adjoining county.

█ On the trial, the prosecuting attorney made reference in his opening statement to a telephone call received by Barbourville Chief of Police from appellant's brother at Ft. Knox. The Chief of Police also was permitted to testify concerning this call. It is proper for the Chief of Police to explain that he came to the scene of the killing as a result of a call from appellant's brother, but no reference should

be made to any report to the officer incorporating any charge of appellant's misconduct or violation of law. Comments of the prosecuting attorney likewise shall be limited.

Neither do we decide whether error was committed in the manner in which the jury's view of the crime scene was had. On another trial care will be taken that the accused is permitted to accompany the jury, under the trial judge's personal supervision, if a jury view is had. KRS 29.268.

■ There was no error in admission of evidence that about eight months prior to the shooting appellant (when arrested by Smith for another crime) had said that Smith "had bought a one-way ticket." This reference tends to disclose a feeling of animosity against the victim by the accused. It bears upon the attitude of appellant toward decedent and supports the prosecution's theory of malice; it affords basis for motive. Under these circumstances the evidence is proper, even though it collides with the general rule against admission of other crimes. See Roberson's New Kentucky Criminal Law and Procedure, 2nd Ed., § 1794, pp. 1899, et seq; and collected cases 6 Ky.Dig. 1, Criminal Law, ©=369(15), 372(1, 12).

■ The statements of appellant's mother, some of which she admitted, were properly received in evidence. She was so closely enmeshed in the events that her utterances were clearly those of an actor in the event. See the well-reasoned opinion in Louisville Ry. Co. v. Johnson's Adm'r, 131 Ky. 277, 115 S.W. 207, 20 L. R.A.,N.S., 133. Her statements were part of the *res gestae*; they are not to be considered mere outcries of a bystander. The fact that Mrs. Hemphill was not a party to the litigation does not preclude her status as an actor within the meaning of *res gestae*. 20 Am.Jur., Evidence, § 674. By the same standard, the utterance of Nancy Hampton was properly admitted. She too was an actor. In short, as has

been well said, these statements were the facts speaking through the person rather than the person talking about the facts. 20 Am.Jur., Evidence, § 662.

The judgment is reversed for proceedings consistent with the opinion.