Lonnie **FUGATE**, Appellant,

v.

**COMMONWEALTH** of Kentucky, Appellee.

Court of Appeals of Kentucky.

Oct. 3, 1969.

Courtney C. Wells, Hazard, for appellant.

John B. Breckinridge, Atty. Gen., Frankfort, Joseph Eckert, Asst. Atty. Gen., for appellee.

PALMORE, Judge.

At about dusk on April 7, 1968, Bernis Campbell was struck and killed by a motor vehicle moving northward on Kentucky Highway 267 in Perry County. There were no eyewitnesses other than the occupant or occupants of the vehicle involved, which evidently left the scene without stopping. On the basis of testimony by witnesses who saw Lonnie Fugate's truck shortly before the incident happened, together with other circumstantial evidence, and an admission made by Fugate later in the same evening that he had run over and killed a man, a jury found Fugate guilty of involuntary manslaughter in the first degree and fixed his sentence at five years in the penitentiary. KRS 435.022(1). He appeals, contending the evidence was not sufficient to justify finding him guilty of the offense.

At the trial Fugate denied any knowledge of or involvement in the accident and disavowed the inculpatory statements and conduct attributed to him by witnesses for the Commonwealth.

The indictment charged Fugate with voluntary manslaughter (KRS 435.020) by operating a motor vehicle in a "negligent, reckless, careless and wanton manner," causing Campbell's death. Though formerly recognized as a species of voluntary manslaughter, the crime of causing the death of another by reckless and wanton conduct was reduced to involuntary manslaughter of the first degree by the enactment in 1962 of KRS 435.022, and the instruction under which Fugate was found guilty was drawn in conformity with that statute.

Before 1962 there were three degrees of unintentional homicide by negligent operation of a motor vehicle: (1) voluntary manslaughter by "reckless and wanton" conduct; (2) involuntary manslaughter by gross negligence; and (3) the statutory crime of homicide by ordinary negligence, KRS 435.025. Stephens v. Com., Ky., 356 S.W.2d 586, 587 (1962).

There are still three degrees of unintentional homicide by negligent operation of an automobile, the first two of which have been redefined by statute. They are: (1) involuntary manslaughter in the first degree, through causing the death of another "by an act creating such extreme risk of death or great bodily injury as to

manifest a wanton indifference to the value of human life according to the standard of conduct of a reasonable man under the circumstances," KRS 435.022 (1); (2) involuntary manslaughter of the second degree, through causing the death of another "by reckless conduct," KRS 435.022(2); and homicide by ordinary negligence, KRS 435.025.

■ The instructions given in this case covered all three degrees, but since the verdict was returned under the first degree instruction, that is the one against which the probative weight of the evidence must be measured.

■ In Lambert v. Com., Ky., 377 S.W. 2d 76, 79 (1964), the term "wanton" as used in KRS 435.022(1) was thus defined: "A wanton act is a wrongful act done on purpose in complete disregard of the rights of others. The actor must have conscious knowledge of the probable consequences and a complete disregard for them." This is the definition required to be given as a part of the instructions. Hemphill v. Commonwealth, Ky., 379 S. W.2d 223, 227 (1964).

The briefs of counsel are focused on the question of whether the evidence was sufficient to identify Fugate as the person whose vehicle struck the decedent. The evidence adduced in the case also was directed almost exclusively to the matter of tying Fugate to the accident, with the result that the information concerning physical details is meager and unsatisfactory. We have no difficulty in concluding that the evidence was enough to identify Fugate as the guilty party. Considering, however, that the gravamen of the offense inheres in the manner in which he was operating his vehicle at the time it struck and killed Campbell, the real question to be decided is whether the evidence in that respect was sufficient to justify a finding that his negligence was of the highest degree short of an intentional killing, "an act creating such extreme risk of death or great bodily injury

as to manifest a wanton indifference to the value of human life according to the standard of conduct of a reasonable man under the circumstances."

We shall confine our summary of the evidence to the facts and circumstances that are reasonably relevant to that issue.

The road on which Campbell was killed borders along Sixteen Mile Creek, which runs from south to north, so that a person traveling north is referred to as going "down" the creek and one traveling south is referred to as going "up" the creek. It has a blacktop surface, but there was no showing of how wide it is. Neither was it shown whether the accident took place on a curve or on the straightaway.

The body was found by Harve Hensley, Judge of the Perry County Court. Judge Hensley had been visiting at Napier's store, which is located on the roadside one-half mile south (up the creek) of the accident scene. As he was preparing to depart, he saw the headlights of a vehicle pass by on the road, going down. He does not know whether it was a car or a truck, nor did he estimate its speed. He left two or three minutes thereafter, proceeded down the road in the same direction at about 30 m.p.h., and came upon the body within three or four minutes after having seen the headlights of the vehicle passing Napier's store. Campbell was lying in the center of the road, dead or dying, and blood was running down the middle of the road from his body. An inspection of the road disclosed "some spots of blood back up the road from where the body was laying and it looked like he had been drug on the road, whatever there did hit him, looked like it was traveling down the road," and the distance the body appeared to have been dragged was "about 15 or 20 feet, close to that." The witness did not examine the body and did not know whether there were any broken bones.

According to Judge Hensley, Campbell's sister, Marie Combs, "lived straight across from where I found him, and 100 yards

back up that way." He could see lights in the house, and after he sounded his horn to attract their attention Marie, Astor Campbell (brother of the deceased), Margaret Campbell (Astor's wife), Balis Campbell, Jr., and Marie's children came out to the road.

Willie Smith, who lives one-fourth of a mile above the Marie Combs place, was driving up the road (south) on his way home between 8:00 and 8:30 P.M., and in a sharp curve of the road 1¼ miles below (north of) the scene of the accident he met a truck going in the other direction (down) at about 45 to 50 m.p.h., "a pretty good rate of speed on that road * * *. All the roads [sic] down Sixteen Mile are real sharp and narrow curves." He identified the vehicle as a ¾-ton truck with "two lights up on the cab." Smith soon arrived at the place where Marie Combs and the others were gathered in the road around the body. He observed that "up above where he were laying, some 15 or 20 feet, there was blood on the highway, looked like where he had been drug." The witness was not able to say just where Campbell was when he was struck, but said "it looked like he was more on the left, I don't know" (referring to the left side coming down).

Marie Combs testified that she lived "door neighbor" to Bernis Campbell, that the front of her house was about 30 feet (another witness said 60 feet) from the road, and that the place where Bernis was struck was almost in front of her door. At about 8:00 P.M. she had finished supper and was waiting for her brothers Astor and Bernis and two companions, Balis Campbell, Jr., and Marcus Jones, to come in. She saw them pull into her driveway, "and they had been pulled in about two minutes and I saw a truck going past with the lights turned out * * * and, I guess, something like a minute after that we heard this horn blow * * * and we ran out in the yard" and found Judge Hensley, who told them someone had been killed. Marie then discovered that the vic-

tim was her brother, Bernis. She said that he was still warm and was not yet dead.

Marie inspected the highway the next morning. "I went over and looked at the wide place where he was standing * * *. About three feet on the—out in the wide place on the left of the road, there was blood and hair laying there and there, to where they started dragging him, where he was hit, down to the highway where we found him." "About how far was that?" "I would say 40 feet from where he was killed at the wide place."

Rodney Maggard, a state trooper, investigated the accident in response to a call received at 8:25 P.M. He found Campbell lying in the middle of the road and deduced that he had been hit by a vehicle going north down the creek which "struck the pedestrian and drug him 22 feet and six inches on the highway and leaving the scene." Trooper Maggard at once investigated all along the highway and up the side roads in an unsuccessful search for the offending driver and vehicle, then "went back and made out my accident report and furthered the investigation * * *. I went back to the scene and found that the victim had been struck from the side of the road rather than the center of the road, about 2½ feet off the main highway, and had been drug down the road by this vehicle, approximately 40 feet."

The trooper was not asked and did not say what were the physical facts on which he based the foregoing conclusion or to which side of the road he was referring, or exactly what he had in mind as "the main highway." (In this connection, it will be recalled that Marie Combs gave her estimate of the point of impact as three feet "out in the wide place on the left of the road.")

Marcus Jones and Balis Campbell, Jr., two of the occupants of the car that arrived at the Marie Combs house just before Bernis Campbell was killed, said

that they had picked Bernis up at Gran Fugate's and let him out at a wide place in the road in front of Marie's house. According to Jones, Bernis lived "across from her and we let him out right by his house." Bernis' brother, Astor Campbell, the driver, also said they let Bernis out "at the wide place * * * we went to a wide place and went around in kind of a lane and into the garage and left the car there and me and Marcus got out and went in the house and left Balis sitting there." None of these witnesses, including Balis, who stayed in the car 30 feet from the road, heard the sound of a passing vehicle or its impact with the body of Bernis. All denied that any of them was drinking, though Balis was a little evasive, saying he "didn't know" whether Bernis was drinking and, "If he was drinking it was more than I seen. We didn't stay in the car all the time."

Ken Terry, the county coroner, testifying as to the cause of Campbell's death, said "he had a hemorrhage of the brain and internal injuries to the chest and his legs were mangled and broken up and there was no doubt that he had been contacted or run over by an automobile or some object of that kind." Terry did not describe how or the extent to which he examined the body.

With respect to visibility, the time of day was described by Judge Hensley as "just after dark" or at the "edge of dark." Marie Combs said that when the vehicle with her brothers and their friends pulled into her driveway (about two minutes before she saw a truck without lights go by) it "wasn't exactly dark, it was just barely getting dark."

There was evidence to the effect that the appellant, Fugate, was drinking beer later in the evening when he is alleged to have said he had run over and killed a man, but no evidence that he had been drinking at the time Campbell was killed unless it could be inferred from this response he is said to have uttered (but which he denied) when asked why he did not report the accident to the police: "I have swore off drinking and was facing the penitentiary."

When the police examined Fugate's truck the next evening they apparently did not find any evidence to connect it with Campbell's death. However, a schoolboy testified that earlier in the morning Fugate had offered him a dollar to wash the truck, at which time the boy noticed blood on the right side under the bottom and on the bumper. He said Fugate explained that he had killed a dog. The witness declined to wash the truck, and there was no other evidence of its physical appearance after it is alleged to have struck and run over Campbell.

In Casey v. Commonwealth, Ky., 313 S. W.2d 276 (1958), an automobile struck and killed a man walking on a wide berm on the right side of the highway in a small mining town. The physical evidence was that the right wheels of the car left the pavement and ran 70 feet along the berm before striking the pedestrian, then carried his body 87 feet until the car struck a rock, and threw the body 30 feet from there. The victim's neck was broken, his skull fractured, and "his body otherwise bruised and cut." The driver was convicted of voluntary manslaughter (based on "reckless and wanton" conduct), and given a sentence of two years in prison. In affirming, this court said:

"The physical facts, such as objects and conditions of the place and the crushed body of the man, which were perceived by the sense of sight and described with fair accuracy, afford the reasonable conclusion that the appellant was driving at a very high rate of speed through a populated area. It appears that as he was entering a broad curve in the road he veered off the paving and struck the pedestrian at a place where the man had a right to be. There is no merit in the appellant's contention that he was entitled to a directed verdict of acquittal." 313 S.W.2d at pp. 277, 278.

In Stephens v. Commonwealth, Ky., 356 S.W.2d 586 (1962), two cars collided head-on and the driver of one of them, who was alone, was killed. One of the cars had left skid marks 53 yards long and, emerging from a sharp curve, had veered wholly into the opposite traffic lane and caused the accident. The jury found that the defendant was the offending driver, convicted him of voluntary manslaughter (again, based on "reckless and wanton" conduct), and sentenced him to two years in prison. Though denying that he was the guilty party, the defendant admitted to a state trooper that he "had drunk a can of beer or two." In reversing, we held that the highest degree of homicide that could be found from this evidence was involuntary manslaughter by gross negligence, and commented as follows:

"We do not know how sharp the curve was or to what speed the Stephens car had slowed at the end of the 53-yard braking distance. However, it is reasonable to infer from the physical evidence that as Stephens drove through the curve he was going too fast to keep his car in its proper traffic lane. It seems fairly certain from the testimony that he knew the road, but there was no evidence as to how heavily traveled it was."

\* \* \*

"The most that can be said to have been proved in this case is that Stephens caused the accident by driving to the wrong side as he rounded a curve too fast on a road with which he was familiar. Under the 'reasonable doubt' standard of criminal law, does this evidence support a finding of reckless and wanton conduct? A majority of the court thinks it does not.

"It ,is rather harsh to make any unintentional offense a felony. The basic justification for classifying a homicide through negligent conduct as 'voluntary' manslaughter (an obvious contradiction in terms) is that under certain circumstances a man's actions may be so heedless of the natural and probable consequences to others that he ought not be heard to say that although he intended the heedless conduct itself he did not intend its consequences. Here we may assume from the evidence that the appellant intentionally drove his automobile at a speed that was excessive in view of the topography of the highway. In so doing he committed a misdemeanor in failing to operate his vehicle in a careful manner (KRS 189.290, 189.-990) and perhaps violated KRS 189.300 by failing to keep to the right. Thus he was negligent per se, but felonious recklessness, it seems to us, requires a positive likelihood, a probability, of accident and injury."

\* \* \*

"Though we do not accept appellant's proposition that a case of voluntary manslaughter by automobile cannot be established solely by the physical facts and circumstances (to the contrary, see Casey v. Com., Ky., 1958, 313 S.W.2d 276), it is our conclusion that excessive speed on the open highway, without any evidence of how excessive it was or what other conditions attended or led up to it, does not necessarily forecast a sufficient likelihood or probability of accident and injury to support a verdict of voluntary manslaughter." 356 S.W.2d at p. 587.

See also Lewis v. Commonwealth, 301 Ky. 268, 191 S.W.2d 416 (1945), in which there appeared to be evidence from which it could have been inferred that the defendant's vehicle was on the wrong side of the road when it struck and killed two boys on bicycles, but it was held that the trial court should not have instructed on a higher degree than involuntary manslaughter, which was the substantial equivalent of today's second degree involuntary manslaughter.

■ The evidence in this case presents even less of a picture of what happened and how it happened than did the evidence in *Stephens*. We cannot avoid the conclusion that it was insufficient to justify a finding that at the time of the accident

Fugate was driving his truck in such a reckless manner as to create an "extreme risk of death or great bodily injury" manifesting "a wanton indifference to the value of human life."

█ We do not overlook the fact that flight and attempts at concealment are circumstantial evidence of guilt, because they suggest a guilty state of mind. Noah v. Commonwealth, 273 Ky. 272, 116 S.W.2d 315, 319 (1938); 40 Am.Jur.2d 589 (Homicide, § 319). Sometimes the principle is stated in language to the effect that flight raises a "presumption" of guilt. Cf. Roberson's Kentucky Criminal Law and Procedure (2d ed.), § 498, p. 668; Noah v. Commonwealth, supra. In that connection the term "presumption" is a misnomer. "There is no real presumption of guilt from flight * * *. Nor from any other conduct of the defendant evidencing *consciousness of guilt.*" Wigmore on Evidence, § 2511a, fn. 1 (3d. ed., 1940).

"It is well settled in modern times that flight does not raise a presumption of law that the defendant is guilty; i. e., a conclusive presumption of guilt. But it is sometimes said to raise a presumption of fact. A presumption of fact of this character, as applied to a criminal case, clearly does not have the effect of shifting the burden of proof or the obligation of going forward with the evidence, and probably means only an inference * * *. The flight of a person after the commission of a crime and before his arrest is, under the prevailing rule, a circumstance to be considered with the other circumstances of the case in determining his guilt or innocence." Annotation, *Flight as evidence of guilt*, 25 A.L.R. 886, 887.

Except in those jurisdictions in which the trial court is permitted to comment or instruct on the effect of the evidence, the question of flight and concealment nearly always arises on the point of *admissibility*, and the evidence usually is held admissible because it has probative value as being in the nature of an admission. Conceding

that it does have probative weight in this respect, the question that concerns us here is *how much* weight—that is, in the absence of other evidence from which it could fairly be inferred that the defendant's conduct at the time of the death was "wanton," does the additional circumstance of flight and attempted concealment supply the deficiency? We think not.

█ It is a familiar principle that a defendant cannot be convicted on circumstantial evidence that is as consistent with innocence as with guilt. Cf. Brown v. Commonwealth, Ky., 340 S.W.2d 471, 473 (1960). "Evidence of flight has been said to be circumstantial evidence of guilt, and subject to the rule that, to warrant a conviction, circumstantial evidence must be so convincing as to the guilt of the accused that there is left to an impartial and reasonable mind no theory or explanation of the circumstances consistent with the innocence of the accused." Annotation, *Flight as evidence of guilt*, 22 A.L.R. 886, 889, citing United States v. Jackson (5th Cir. 1886), 29 F. 503.

█ By parity of reasoning, especially when the crime is one that does not involve motive or intent in its commission, circumstantial evidence that is as consistent with a lower degree of guilt as it is with a higher degree cannot provide the basis for a conviction of a higher degree when the rest of the evidence in insufficient to do so. It seems clear to us that a driver's flight from the scene of a fatal automobile accident, and his subsequent attempts at concealment or suppression of evidence, prove at most that he believed he was at fault, which is just as consistent with ordinary negligence under KRS 435.025, or even recklessness under KRS 435.022(2), as it is with "wanton" conduct under KRS 435.022(1). And in this instance, once Fugate had fled the scene of the accident he had still another crime to conceal. Cf. KRS 189.580, 189.-990(1).

The act of leaving the scene of the accident without stopping to render aid, though it may have amounted to gross and wanton misconduct in itself, was of course a separate crime. Commonwealth v. Nevius, Ky., 249 S.W.2d 717, 718 (1952).

Fugate moved for a peremptory instruction of not guilty at the close of the Commonwealth's evidence in chief, but did not renew the motion at the conclusion of all the evidence. If the evidence was sufficient to warrant a conviction of one of the lesser degrees of homicide heretofore mentioned (a question we do not decide), of course there was no error in overruling the motion. Fugate did not offer any objection to the instructions when they were given, but alleged in his motion for a new trial that "the verdict of the jury is not supported by the evidence," so a question arises as to whether his right to challenge the sufficiency of the evidence to support the instruction under which he was convicted was preserved by the motion for a new trial. Cf. Hartsock v. Commonwealth, Ky., 382 S.W.2d 861, 864 (1964); Stanley's Instructions, § 797. We conclude that it was.

It is the duty of the trial court in a criminal case to instruct the jury correctly whether the defendant requests it or not, and this includes the duty of giving a peremptory instruction when the evidence does not prove a public offense. Sizemore v. Commonwealth, 285 Ky. 142, 147 S.W.2d 56, 59 (1941). The duty not to instruct on a higher degree than the evidence justifies is simply another facet of the same principle. An allegation in a motion for a new trial that the evidence does not support the verdict is in substance and effect an allegation that the instruction authorizing the verdict should not have been given.

In reviewing the record we notice that the instruction (No. IV) under KRS 435.025 used the words "recklessly and negligently," whereas the statute predicates the crime on ordinary negligence.

On another trial the word "recklessly" should be omitted and "negligently" should be defined as follows: "The word 'negligently' as used in this instruction means the absence of ordinary care, and 'ordinary care' means such care as an ordinarily prudent person would exercise under circumstances similar to those described in this case." It would be better form also if the other instructions were adapted from and drawn in conformity with the statutory language used in the specimen instructions set forth in Hemphill v. Commonwealth, Ky., 379 S.W.2d 223, 227 (1964), with the definitions appearing separately in the respective instructions to which they pertain.

The judgment is reversed with directions for a new trial.

All concur except OSBORNE and NEIKIRK, JJ., dissenting.

OSBORNE, Judge (dissenting).

I must respectfully dissent from the majority opinion in this case because I believe its effect will be to abolish the offense of involuntary manslaughter in the first degree in all homicides resulting from a misuse of a motor vehicle. It doesn't appear that this result was intended by the framers of the statute. In fact, my research upon the subject proves quite to the contrary. Homicide as a result of an intentional misuse of an automobile was one of the offenses intended to be guarded against.

The law of this Commonwealth as it related to homicide less than murder had become hopelessly confused as a result of conflicting judicial opinions. As a result of this confusion there evolved an offense classified as negligent voluntary manslaughter, which has been described by one eminent, legal scholar in this field as the impossible crime. See Moreland, Kentucky Homicide Law With Recommendations, 51 Ky.Law Journal 59. In an attempt to work our way out of this

confusion, the legislature in 1962 enacted what is now KRS 435.020 and KRS 435.-022, which set out in specific terms the offenses of voluntary manslaughter, involuntary manslaughter in the first degree and involuntary manslaughter in the second degree. This brought our law into line with that found in most jurisdictions relative to these offenses in that our homicide law now consists of murder, which is the killing of a human being with malice aforethought, voluntary manslaughter, which is the intentional killing of a human being without malice aforethought, such as in sudden heat and passion or while sufficiently intoxicated that an intent cannot be formulated, etc. Involuntary manslaughter in the first degree is the killing of a human being as a result of an act creating extreme risks of great bodily injury so as to manifest a wanton indifference to the value of human life according to the standard of conduct of a reasonable man under the circumstances.

Involuntary manslaughter in the second degree is the killing of a human being as a result of reckless conduct according to the standards of a reasonable man under the circumstances.

As could be readily anticipated by anyone familiar with the common law, distinguishing between wanton conduct and reckless conduct has already caused this court some difficulty and no doubt in the future will cause considerably more.

In Lambert v. Commonwealth, Ky., 377 S.W.2d 76, in discussing this problem, we said:

"The words do not have a generally accepted and clear-cut meaning. Some indication of their vagueness may be found in the fact that in 'Words and Phrases,' about seventy-two pages are necessary to summarize the cases dealing with the definitions of 'wanton'; 'reckless' consumes about forty-six pages. It is plain from the wording of KRS 435.-022 that the legislature had in mind two degrees of punishment for separate and distinct acts: one was made felony, and the other misdemeanor. We are required, therefore, to give definitions for two words as used in this statute. *A wanton act is a wrongful act done on purpose in complete disregard of the rights of others.* The actor must have conscious knowledge of the probable consequences and a complete disregard for them. Reckless conduct displays an indifference to the rights of others and an indifference as to whether wrong or injury will result from the act done. Recklessness involves thoughtlessness while wanton conduct involves actual knowledge of the probable result and complete disregard for those results."

For a discussion of the relative quality of the two words "wanton" and "reckless" see the Moreland article, supra, page 119:

"It is of course intended that real meaning be given the word wanton in the definition of involuntary manslaughter in the first degree for otherwise the purpose of adding it to the customary definition of involuntary manslaughter would be defeated. For example, it is not intended that it be interpreted synonymous with "reckless," the word used in defining involuntary manslaughter in the second degree. The two words are *not* synonyms, although sometimes carelessly and loosely used as such, as in the current definition of negligent *voluntary* manslaughter in Kentucky. One of the most satisfactory definitions of wantonness is found in the dictionary where it is defined as 'arrogant recklessness.' Recklessness is the word that is most commonly used in describing the behavior required for the negligent involuntary manslaughter. The addition of the adjective 'arrogant' is indicative of the 'still higher degree' of danger and 'depraved mind' commonly required in other jurisdictions for murder. It is intended that the use of the phrase 'wanton indifference to the value of human life' in the definition of involuntary manslaughter in the first degree shall

serve to bring those cases which would be negligent murder in other jurisdictions, and which are presently negligent *voluntary* manslaughter in Kentucky, into the coverage of the *involuntary* manslaughter in the first degree provision recommended in the proposed act." [1]

The general principles of law to be applied to statutes such as ours and which are generally applied may be found in 7 Am.Jur.2d Automobiles and Highway Traffic, p. 838, § 291, wherein the principle is stated as follows:

"A number of states have enacted statutes providing that where the death of a person ensues as a proximate result of injury received by the driving of any vehicle in reckless disregard of the safety of others, the person so operating such vehicle is guilty of reckless or negligent homicide. Since the substance of the crime of reckless or negligent homicide is the operation of a vehicle with reckless disregard for the safety of others, thereby causing the death of another, this means more than ordinary negligence; it is conduct which indicates a wilful or wanton disregard of the consequences to others. In determining the guilt of the accused under such a statute, his manner of driving is to be considered with respect to the time when and the place where the alleged violation occurred, the condition of the highway, the state of the weather, the position of other vehicles, the opportunity for observation and familiarity with the highway, and the chance of being able to stop or avoid a collision. Where death results from the violation of a statutory provision intended for the protection of life and limb on the public highway, knowingly committed under circumstances involving an unreasonable risk of bodily harm to others and a high degree of probability that such harm will result, a conviction of negligent homicide is warranted. The test of reckless-

ness does not lie in speed alone, but in that and other attendant circumstances."

Involuntary manslaughter in the first degree is in many respects identical to the offense of negligent murder under the common law. Under the common law in order to constitute negligent murder, the offense had to be so utterly blameworthy as to show a depraved heart, an individual void of a sense of social duty. Most definitions use the word "wanton" to indicate the indifference to safety of others.

The cases cited in support of the majority opinion Casey v. Commonwealth, Ky., 313 S.W.2d 276, and Stephens v. Commonwealth, Ky., 356 S.W.2d 586, were decided prior to 1962 at a time when we were applying the unworkable rule Negligent Voluntary Manslaughter.

It is true that the word "wanton" was often used in the definition of the offense of negligent murder and copied in defining our old offense of negligent voluntary manslaughter. However, to my mind this fact alone does not mean that the requirements of proof under KRS 435.020 are identical with these old offenses merely because that word is used in the statute. I agree with the Lambert opinion insofar as I would require something more than mere "reckless" conduct, but I would not require the proof to reach the level of that required for negligent murder. Each case will have to be judged upon its own set of facts, what is reckless to one court may be wanton to another. There are no exact lines. The case before us represents one in which the defendant was rightfully convicted of "wanton" conduct by the jury.

From the testimony in this record the jury could well believe that the defendant was operating a truck upon a paved highway at a "high rate of speed" in the dark without lights; that he struck the decedent while he was standing on the paved portion of the road and dragged his body ap-

---

1. The proposed act was later adopted as KRS 435.022.

proximately forty feet without leaving skid marks; that he left the scene without stopping to render assistance and shortly thereafter made the statement to Irma Napier, whose husband was with him at the time, that he had just run over a man and killed him today, and that on the following day he made the open threat that he would kill anyone who informed on him; that shortly after the incident he and all those with him were drinking beer and one of his passengers told the highway patrolman investigating the incident that he was so drunk he didn't remember what happened. In his efforts to conceal the crime, he attempted to hire a school child to wash the blood from under his truck.

The most difficult part of any case is applying the law to the facts. As the defendant was convicted of involuntary manslaughter in the first degree, he must be guilty of causing the death of a human being by an act creating extreme risks of death or bodily injury as to manifest a "wanton" indifference to the value of human life according to the conduct of a reasonable man under the circumstances. In my opinion this was "wanton conduct" as that definition has been historically defined. Of course, it can be argued that the defendant's acts after he had struck the decedent cannot be used in determining whether or not his conduct was wanton at the time. However, I most certainly believe that these acts can and should be considered for the purpose of explaining his motives and attitudes at the time. If he were not wantonly indifferent to the rights of others, why did he travel with his lights off at a high rate of speed? Why did he leave a dying man on the side of the road? Why did he threaten to kill any who told on him? If the proof in this case does not show "arrogant recklessness," then I have extreme difficulty perceiving any set of facts arising out of the misuse of an automobile that would meet this test.

The majority opinion holds that circumstantial evidence, which is as consistent with a lower degree of a crime as it is with a higher degree (such as flight from the scene), cannot provide the basis for a conviction on a higher degree. This simply cannot be true. In larceny cases one who is caught in possession of the property is presumed to have stolen it. This is true even though he could have taken it without felonious intent. There are many other instances where the same rule applies. To me it is shocking that we write completely new and unheard of rules of law into opinions such as this without full and grave consideration of their results. If the legislature so desired, I assume it could say that where evidence is as consistent with a lower degree of a crime as with a higher degree then a conviction upon the higher degree cannot be based upon it. The legislature has not seen fit to do this and I seriously question our authority to do so.

For the foregoing reasons, I respectfully dissent.

NEIKIRK, J., joins in this dissent.