**Bertie Clay SMITH, Appellant,**

**v.**

**COMMONWEALTH of Kentucky, Appellee.**

Court of Appeals of Kentucky.

Nov. 3, 1967.

As Modified on Denial of Rehearing March 15, 1968.

Donald D. Harkins, Begley & Harkins, Danville, for appellant.

Robert Matthews, Atty. Gen., Howard E. Trent, Asst. Atty. Gen., Frankfort, for appellee.

CULLEN, Commissioner.

As a result of an accident in which an automobile struck and killed a highway workman, appellant Bertie Clay Smith was convicted of involuntary manslaughter, *second* degree, KRS 435.022(2), and of failure to stop and render aid, KRS 189.580, 189.990(1). A judgment was entered imposing a sentence of 12 months in jail and a fine of $2,500 on the first charge, and a sentence of six months in jail and a fine of $1,000 on the second charge. Bertie Clay undertook to appeal as a matter of right from that judgment.

The Commonwealth has moved to dismiss the appeal as to the six months' sentence and $1,000 fine on the hit-and-run charge, on the theory that under KRS 21.-

**838**

140(2) a motion for appeal was required in order to obtain appellate review of that part of the judgment. We are overruling the motion because we think that under a proper interpretation of KRS 21.140(1) an entire criminal judgment is appealable as a matter of right by any defendant if among the punishments imposed upon him there is a sentence of confinement or imprisonment of twelve months or more. This interpretation is consistent with the underlying purpose of the statute, which is to make appealability as a matter of right depend upon the existence of a major controversy between the state and the defendant. The extent of the controversy should be measured by the total impact of the judgment on the defendant. Cf. Creech v. Jackson, Ky., 375 S.W.2d 679, Dr. Pepper Bottling Company v. Ricks, Ky., 375 S.W.2d 299.

The issues raised on the appeal will be better understood if we first briefly state the essential facts.

A number of employees of the Department of Highways and of a highway contractor were engaged in doing some ditching and draining work along the sides of the state highway which runs between Burgin and Shakertown (north and south). A backhoe machine was occupying the west half of the highway at the point where the work was being done. Around eight workmen were engaged in various tasks along both sides of the road. Leon Cheatham, one of the workmen, was standing on the shoulder on the east side of the road, across from and a little south of the backhoe machine. South of this place, extending over a substantial distance there were numerous signs calling attention to the project and giving warning to reduce speed. About one-half mile to the south there was a sign announcing the project, containing the words "Proceed Carefully" and "Reduce speed to 35." A little closer to the work point there was a second sign directing a reduction of speed to 25. Finally, some 500 to 600 feet from the work point

there was a third sign directing a reduction of speed to 15. The day was clear and the scene was clearly visible from the south for not less than 800 feet.

A white automobile, coming from the south, entered the work area at 40 miles per hour; it struck Cheatham (who was standing on the east shoulder) and knocked him a distance of 47 feet into a ditch, inflicting fatal injuries; and without stopping or even slowing down the automobile left the scene. A pursuit was undertaken and a white automobile being driven by Bertie Clay Smith was apprehended. She was prevailed upon to return to a place near the scene of the accident, where she was met by several state policemen. At this point, and later in Harrodsburg, she was questioned and the exterior of her automobile was examined. As a result the authorities were convinced that her car was the one that had struck Cheatham and the instant prosecution resulted.

Bertie Clay admitted that she had passed the scene of the accident but she maintained that she was in a line of cars that was moving only 15 mile per hour and she denied that her car struck anyone. However, one of the policemen testified that she admitted when first apprehended that she had passed through the work area at 40 miles per hour. Her car was observed after the accident to have a dent in the right front fender and a bent radio aerial on the right side. She said that these were the results of minor accidents that had occurred several weeks previously.

Although the issue of whether it was in fact Bertie Clay's car that hit Cheatham was vigorously contested on the trial, there is no contention on this appeal that the evidence was not sufficient to establish that fact.

■ The first contention presented is that the evidence was not sufficient to establish that Bertie Clay was guilty of "reckless conduct according to the standard of conduct of a reasonable man under the

circumstances" so as to sustain a conviction under KRS 435.022(2). She contends that at the most the evidence shows only ordinary negligence and not reckless conduct. It is our opinion, however, that the evidence warranted a finding of reckless conduct, which for the purposes of this statute has been defined to mean "conduct done with indifference to the rights of others, and indifference whether wrong or injury will result from the act done." Hemphill v. Commonwealth, Ky., 379 S.W.2d 223. Summarized, there was evidence that in total disregard of three warning signs, the last one directing a reduction of speed to 15 m. p. h., and with clear vision of a congested condition on the highway, with the left side completely occupied by the backhoe and with workmen occupying various positions on or near the pavement, Bertie Clay proceeded at an unreduced speed of 40 miles per hour and struck a workman who was not on the pavement. Surely reasonable minds could consider such conduct to evince an indifference to the rights of others and to whether wrong or injury might result. We think the conduct here is comparable with that which in Stephens v. Commonwealth, Ky., 356 S.W.2d 586, was held to justify an instruction on gross negligence (this being prior to the enactment of KRS 435.022).

It is next contended that the instruction on involuntary manslaughter, second degree, was erroneous, in that it did not follow the form spelled out in Hemphill v. Commonwealth, Ky., 379 S.W. 2d 223. As hereinbefore indicated, the instruction specified in Hemphill defined reckless conduct as being "conduct done with indifference to the rights of others, and indifference whether wrong or injury will result from the act done." The instruction given in the instant case defined reckless as meaning "having little or slight regard for the safety of others, gross carelessness." It would have been better for the court to use the Hemphill instruction; however we do not believe any prejudice could have resulted from the instruction

actually given. At one time "reckless" was equated with "wanton" as a characteristic of conduct punishable as voluntary manslaughter, and gross negligence (failure to exercise slight care) was the basis for involuntary manslaughter. See Marye v. Commonwealth, Ky., 240 S.W.2d 852. As a result of the statute, KRS 435.022, "reckless" has been classified as less offensive than "wanton". See Lambert v. Commonwealth, Ky., 377 S.W.2d 76. Whether the demoted "reckless conduct" is the same as gross negligence is a question we are not required here to decide. We think it is enough to say that a jury would not be expected to make much distinction between "failure to exercise slight care," or "having little or slight regard for the safety of others," and "indifference to the rights of others, and indifference whether wrong or injury will result from the act done."

A third contention is that it is grossly unfair, even of the proportions of a denial of due process, for the law to permit a conviction of the lesser degree of crime, involuntary manslaughter, second degree, under an indictment charging involuntary manslaughter, first degree. The simple answer to this is that as far as the record shows, the indictment charged both degrees.

The next argument is that the instruction on the charge of failing to stop and render aid was erroneous in failing to require the jury to believe that the defendant knew she had struck and injured someone. The instruction given did require the jury to find that the defendant did "willfully and unlawfully fail to stop and ascertain the extent of injury and make her identity known and render assistance." In our opinion this instruction, in coupling together the factors of stopping, ascertaining the extent of the injury, making known her identity, and rendering assistance, necessarily required a belief that the defendant knew there was someone with an extent of injury to be ascertained, to whom

her identity should be made known, and to whom should be rendered assistance.

■ Another contention is that the court erred in admitting in evidence photographs of the warning signs containing directions for speed reductions. It is argued that this evidence might have led the jury to believe that the signs established official speed limits the violation of which was negligence per se, whereas under KRS 189.390(3) a limit lower than the regular open highway limit of 60 m. p. h. can be established only by *official order* of the Commissioner of Highways. We are not persuaded that any prejudice could have resulted from the evidence. The issue in this case, as clearly stated in the instructions, was one of *reckless* conduct. If the jury believed, as apparently it did, that the defendant drove through the congested work area at 40 miles per hour, ignoring the visible conditions at the scene and ignoring the multiple warning signs, it surely could have made no difference in their minds whether or not the warning signs established *official* speed limits. We think that evidence as to the signs was admissible as bearing on the question of the existence of warnings of the amount of caution necessary to safely negotiate the work area, and that it was unnecessary under the circumstances to admonish the jury (as the defendant requested) that the signs did not fix an official speed limit.

■ Next, it is argued that the court erred in allowing the introduction in evidence of photographs showing a state trooper holding the victim's trousers in a vertical position against the right front fender of the appellant's car. The purpose of the evidence was to illustrate that a spot of white paint found on the seat of the trousers would have been at the same height from the ground, when the trousers were being worn by a man, as the dent in the fender, thus tending to show that it was in fact the appellant's car that struck the victim. We think it was error to admit these posed photographs. See Nunnelley's Adm'r v.

Muth, 195 Ky. 352, 242 S.W. 622, 27 A.L.R. 910. However, we do not believe that the evidence could have been prejudicial. There was ample evidence that it was the appellant's car that struck the workman. There was testimony that white paint was found on the trousers and that laboratory tests showed it to be of the same kind as on the appellant's automobile; and that the dent in the fender showed lines indicative of contact with corduroy trousers (such as were the victim's). The photographs were mildly cumulative and surely not of dispositive weight.

Another claim of error relates to the admission in evidence of a particle of fabric removed from a crack on the right front fender of appellant's car and later identified as being of the same material as the victim's jacket (again the purpose of the evidence was to prove that it was appellant's car that struck the victim). The particle was found by police officers who made a close inspection of the fender while the appellant was being questioned at the courthouse in Harrodsburg. The appellant claims that the particle was obtained in an illegal *search;* that although she did not voice an objection to the inspection of the car she at the time was in effect in police custody and she had not been advised of her right to counsel or of her right to insist upon a search warrant. The police officers testified that she was not under arrest, that they had informed her of her right to counsel, and that she freely consented to the inspection of her car.

■ We find it unnecessary to consider the question of consent or lack of consent because in our opinion there was *no* "search" or at least no *unreasonable* search within the meaning of the Fourth Amendment to the Federal Constitution and Section 10 of the Kentucky Constitution. See Cooper v. State of California, 386 U.S. 58, 87 S.Ct. 788, 17 L.Ed.2d 730. As pointed out by the Supreme Court in Warden, Maryland Penitentiary v. Hayden, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782,

the principal object of the Fourth Amendment is the protection of *privacy* rather than property. Here, there was no invasion of privacy in the inspection of the *exterior* of the appellant's automobile.

 Another contention is that the trial court erred in denying appellant's motion that a test and demonstration be made on the highways north of the scene of the accident to show the incredibility of the testimony of one of the Commonwealth's witnesses concerning his having kept the appellant's automobile in sight during his pursuit of it after the accident. Appellant cites no authority. It appears from our own limited research that demonstrations or experiments may under certain conditions and circumstances be conducted outside the courtroom, in the sound discretion of the trial court. See 29 Am.Jur., Evidence, Secs. 818, 819, pp. 908 to 910. We would think that their use should be restricted to situations in which the desired facts cannot reasonably be established by ordinary evidence; otherwise there could be a serious impairment of orderly progress of a trial. In the instant case the credibility of the testimony could have been attacked by testimony of other witnesses as to the conditions of visibility in the area in question. Furthermore, it would have been extremely difficult to reconstruct the same conditions so as to make a fair test or demonstration. It is our opinion that the trial court did not err in overruling the motion.

As a final contention the appellant claims that the jury may have been prejudiced as a result of *insincere* weeping in the courtroom by the victim's widow. The point is not properly raised because no objection was made on the trial or in the original motion and grounds for a new trial. The alleged insincerity is attributed to the fact that the widow was keeping company at the time of the trial with a man whom she married shortly after the trial, which fact was not discovered by the appellant until after the filing of the orig-

inal motion and grounds for a new trial. Whether the late discovery could excuse the lateness of the objection we need not decide because, first, the widow might genuinely have suffered grief upon being reminded of the circumstances of death of her late husband even though she was contemplating another marriage; and, second, we do not see how any practical way can be devised to measure the impropriety of emotional outbursts in a courtroom on the basis of sincerity or lack of it.

The judgment is affirmed.

All concur except OSBORNE, J., who did not sit.