Fred **PARTIN**, Appellant,

v.

**COMMONWEALTH** of Kentucky, Appellee.

Court of Appeals of Kentucky.

Oct. 3, 1969.

Don B. Mills, Barbourville, for appellant.

John B. Breckinridge, Atty. Gen., Howard Trent, Asst. Atty. Gen., for appellee.

PALMORE, Judge.

Fred Partin appeals *in forma pauperis* from a judgment sentencing him to 10 years in prison pursuant to a verdict finding him guilty of first degree involuntary manslaughter in the death of his mother, Icevania Partin, from a shotgun wound. KRS 435.022(1). His appointed counsel, who has ably represented him both in the trial and on this appeal, makes three arguments, (1) that the evidence was not sufficient to support the verdict, (2) that inferences drawn by the Commonwealth's Attorney during the questioning of a witness and in the course of his closing argument raised false issues prejudicial to the appellant, and (3) that appellant was entitled to a new trial on the ground of newly discovered evidence. We find no prejudicial error.

The indictment was for voluntary manslaughter, KRS 435.020, but after the evidence was in the trial court confined the instructions to involuntary manslaughter of the first and second degrees, KRS 435.-022(1) and (2).

The tragedy occurred in the victim's home at Kay Jay, in Knox County. Three persons were present, the appellant, his mother and James F. Centers, a friend. Appellant and Centers had been on a trip to Tennessee during the afternoon and had drunk some beer and moonshine. Mrs. Partin arrived at home around 9:00 or 10:00 P.M., following which she and Centers sat in the kitchen and talked for about 1½ hours while appellant stayed in the adjacent bedroom reading. Appellant had a job in Ohio and had been visiting his mother for several days, intending to re-

turn to Ohio the next day. He had an old shotgun which was kept in the bedroom, and says that on the previous day his mother had told him she kept the gun cocked; that he suddenly recalled this and picked up the gun for the purpose of uncocking and unloading it in order to prevent the occurrence of an accident that might happen after his departure for Ohio the next morning; and that just as he tested the hammer to see if the gun was cocked someone spoke to him. "And I turned kindly sideways to see who it was, around like that. And it was her, I reckon. Anyway, she grabbed the shotgun. That's it." The gun went off accidentally (according to appellant) and Mrs. Partin received a fatal wound in the right side, dying shortly thereafter. Centers went for help, and the appellant left the home either before or just after he returned. He was arrested the next day at the home of a friend in the next county.

Centers testified that he and Mrs. Partin had been sitting in the kitchen talking for about an hour and a half when "she just got up and started in to where Fred was and I followed. * * * Well, when she —when she—she went to the door first, the middle door led into the middle room from out of the kitchen, and I was right behind her. And she got into—in front of the heating stove—just in front of the heating stove a little bit, and she stopped for a minute. And she looked up and he had the gun up like that, something like that. And, so, she said, Fred, put that thing down. Just like that. And she grabbed for it and started toward him, one of the two. And I turned around and started to sit down on the bed, and naturally, when a man when he starts to set down he'll—he'll look and see where he's setting. And just as I started to set down, well, then, I heard the shot."

The witness had not seen appellant with the gun before this time, and he says there had been no harsh words between appellant and Mrs. Partin. Appellant was standing with his back to Centers and Mrs. Partin as they entered the room: "She came up from this position like this, and he was standing with his back towards us, and he put the gun down to his side like that, on the right side. And when she said, Fred, put that thing down, she hesitated just for a thought, maybe a couple of seconds, something like that. She was in front of the heating stove. And she walked on towards Fred, put that thing down. And I don't know whether she grabbed him or what."

Centers estimated that Mrs. Partin was about three feet from the appellant when he (the witness) took his eyes off them in order to seat himself on the bed and said he did not know if she took hold of the gun. He testified that although he and the appellant had been drinking, neither was drunk.

▆▆▆▆ "The killing of a human being with a deadly weapon raises an inference of malice. * * * Where killing with a deadly weapon has been shown, the state is not required to negative the possibility that there were circumstances reducing the homicide below that of murder or excusing it altogether." Pittman v. Commonwealth, Ky., 242 S.W.2d 875, 878 (1951).

"The fatal use of a deadly weapon against a vital part of the body of another, when established as a fact, warrants the inference that the act was done with the specific intent to take life * * *. The prosecution need not negative any probability that the offense was the result of an accident, or that there were circumstances reducing the homicide below murder or excusing or justifying the accused altogether." 40 Am.Jur.2d 529 (Homicide, § 265).

▆▆▆▆ The rule expressed in the foregoing quotations probably originates in the common sense proposition that the killing of a person by a deadly weapon does not ordinarily happen by accident; hence the one who did the killing risks being convicted of an intentional homicide unless he comes forward with an explanation to mitigate or

excuse his action. We think it is equally true that an accidental killing by a deadly weapon does not ordinarily happen except through the very highest degree of negligence—that is, "by an act creating such extreme risk of death or great bodily injury as to manifest a wanton indifference to the value of human life," etc.; hence if the evidence suggests enough possibility of accident that the usual permissible inference of intentional killing would not be justified, the one who did the killing must risk being convicted of involuntary manslaughter in the highest degree unless he comes forward with an explanation sufficient to exculpate him or reduce the crime to second degree manslaughter. Cf. KRS 435.022(1) and (2). The violent killing of one person by another, especially with an instrument designed or calculated to produce death or great bodily harm, casts the killer in a dark light from which it should be and is up to him to extricate himself before a jury.

■ In this particular case the grand jury evidently thought there was enough indication of a shooting in sudden heat of passion or sudden affray that an indictment for murder would not be warranted, and the trial court apparently felt that there was enough suggestion of accident that an instruction on voluntary (intentional) manslaughter would not be justified. Appellant may well have been fortunate in both respects. So we come to this: The Commonwealth proved the killing by a witness who professed not to have seen the actual shooting, but did provide enough information to suggest that it was accidental rather than intentional. This was sufficient, in our opinion, to raise an inference of extreme negligence amounting to "wanton" conduct as defined in Lambert v. Commonwealth, Ky., 377 S.W.2d 76, 79 (1964), and in the instructions. It was therefore incumbent on the appellant to explain it away to the satisfaction of the jury. The jurors were not persuaded by his explanation. They were, of course, not obliged to accept it.

■ One of the incidents of which appellant complains consisted of the following exchange of questions and answers between the Commonwealth's Attorney and the witness Centers:

Q– "Now, James, Mrs. Partin had this gun there before this shooting took place, didn't she?"

A– "I don't know sir."

Q– "Didn't she get the gun and load it and try to get you boys out of there?"

A– "No, sir."

Q– "Didn't you tell Trooper Miracle that she loaded the gun?"

A– "Not as I recall sir. No, sir."

Q– "Well, you—you wasn't drunk when she got there, were you?"

A– "No, sir."

Q– "And didn't Fred have this gun pointing it around there acting like these kids that have a tommy gun, making funny noises and clicking it?"

A– "No, sir."

Q– "Did you tell the officer that?"

A– "I never told him anything, only just—I'm just telling the same thing I'm telling you sir."

Q– "Have you—

A– "To the best of my ability."

Trooper Miracle followed Centers as a witness but was not interrogated by counsel for either side with respect to any of the questions appearing in the foregoing excerpt. Appellant contends that the asking of these questions without a subsequent offer of proof that the things thereby suggested actually took place or existed was prejudicial conduct. Cf. Woodford v. Commonwealth, Ky., 376 S.W.2d 526, 528 (1964), and Rowe v. Commonwealth, Ky., 269 S.W.2d 247, 249 (1964), in which this

court said, "The attorney for the Commonwealth may not deliberately inject into the case an issue prejudicial to the rights of the defendant without some reasonable basis for the questions."

We need not decide whether these particular questions were prejudicial, because appellant's objection appears for the first time in his motion for a new trial. When the Commonwealth announced completion of its proof without having introduced any testimony that would have provided a basis for the questions, appellant's failure to move then and there for whatever relief he wanted constituted a waiver. Senibaldi v. Commonwealth, Ky., 338 S.W.2d 915, 919–920 (1960).

■ Just prior to the closing arguments of counsel the Commonwealth's Attorney, in view of the jury, listened by earphone to a portion of the taped recording of the evidence. Later, in his closing summation, he said, "Fred Partin said he picked up the shotgun and uncocked it before his mother ever came into the room, and I know that is what he said because I have just now listened to his testimony again right over there" (pointing to the tape recorder). Appellant's objection was overruled, and the trial judge asked his counsel if he wished to listen again to the statement himself. Counsel declined, and moved for a mistrial.

The transcript of evidence shows that appellant said he "kindly, you know, let the hammer down and it was cocked. And about that time somebody spoke to me." Probably he meant that he merely tested the hammer to see if it was cocked, but we think it could be argued that when he said he "let the hammer down" he meant he had momentarily uncocked it. We do not consider the argument improper.

■ Appellant contends also that the jury should have been discharged when the

Commonwealth's Attorney made a statement to the effect that there had been a disturbance at Mrs. Partin's home earlier in the evening before she was killed. We agree that the statement should not have been made, but are not convinced it was substantially prejudicial.

The ground of newly discovered evidence was supported by an affidavit of the county coroner, who said that his examination of Mrs. Partin's body disclosed the presence of powder burns on her right side and right hand. The affidavit explained that appellant's counsel had asked the affiant about powder burns before the trial, at which time affiant did not recall having noticed any, but that upon further reflection he had decided he was mistaken, and that the body did show the powder burns mentioned.

■ "The rule is that in order for newly discovered evidence to support a motion for new trial in a criminal case it must be of such decisive value or force that it would, with reasonable certainty, have changed the verdict or that it would probably change the result if a new trial should be granted." Kinmon v. Commonwealth, Ky., 383 S.W.2d 338, 339 (1964); Wheeler v. Commonwealth, Ky., 395 S.W.2d 569, 572 (1965).

■ The presence of powder burns on the victim's right hand and body would tend to prove only that the fatal shot was fired at close range, about which fact there was no question anyway. It does not seem probable, or even substantially possible, that the additional evidence of the coroner would have changed the result of the trial or change the result on a new trial.

The judgment is affirmed.

All concur.