Britton **PRESTON** and Melvin Caldwell, Appellants,

v.

**COMMONWEALTH** of Kentucky, Appellee.

Court of Appeals of Kentucky.

June 10, 1966.

As Modified on Denial of Rehearing
Oct. 7, 1966.

Joe P. Tackett, Prestonsburg, for appellants.

Robert Matthews, Atty. Gen., Robert D. Preston, Asst. Atty. Gen., for appellee.

PALMORE, Judge.

Britton Preston and Melvin Caldwell were jointly indicted, tried and convicted of armed robbery and sentenced to life imprisonment. KRS 433.140. They appeal.

According to the evidence presented in support of the indictment, one George B. Blanton and two friends, William C. Powers and Smith Kelly, Jr., were drinking beer in the kitchen of Blanton's home in the Green Rock neighborhood of Johnson County, Kentucky, during the late hours of Saturday night, June 6, 1964, and until shortly after midnight, when someone knocked at the front door, which was located in an adjoining room. Kelly went to the door and in a moment returned and said to Powers, "Let's get out of here." As Powers made his way to the front door he met and passed a man coming in. At the trial he expressed the belief that this man was the appellant Caldwell, though he would not positively swear to it. Powers got into his automobile with Kelly and undertook to leave the premises, but in backing out he accidentally "let the wheel drop back over the hill." When this happened he said to Kelly, "Get the jack and jack the car up," to which Kelly replied, "Let's get out of here, they are robbing George B." Powers then said, "Well, give me the gun out of the glove compartment," but at that point a man standing at the corner of Blanton's house, whom Powers could not identify, said, "Buddy, you stay out of it," and fired a shot, whereupon Powers "fell over the fence and laid in the creek until they brought George B. out of the back of the house, and was pushing him up the road and telling him to run," etc. The two robbers then got into their car and drove away.

Blanton testified that the first man to enter the house walked into the kitchen and struck him over the head with a pistol, got him down on the floor and took some $500 in money out of his pockets, after which he forced him to go into the other room and lie down on a bed, face down, threw a quilt over his head and told him if he moved he would be killed. Then the second man entered, and Blanton, who says he "could see out from under the cover," recognized him at once as the appellant Melvin Caldwell, whom he had known "ever since he was a baby." The two intruders proceeded to ransack the house and at length got Blanton up, took him out the back door, and at gun point forced him to walk about 100 yards up the road. According to Blanton, the two men returned to the inside of the house before leaving, though Powers says they drove away without again entering the house. Blanton then came back, ran down the road to his son's home a mile or so away, and telephoned the police.

Blanton said he never had seen or known the appellant Preston before the robbery, but that when he returned to the house immediately after his assailants had driven away, and before he ran on to his son's home, Kelly and Powers told him who he was. At the trial Blanton positively identified Britton Preston as the man who had struck him in the head with a pistol.

Smith Kelly, Jr., did not appear to testify at the trial. His identification of Preston right after the commission of the robbery was related to the jury only through Blanton's testimony, which we have already recited. The first question to arise is whether Blanton should have been permitted to relate what was told him by either Kelly or Powers. The answer is not entirely easy, as the facts make this a close case. It therefore may be well to approach it from the fundamentals.

 According to Wigmore, and it is demonstrably so, courts in general have reduced the term "res gestae" to a useless and misleading shibboleth by embracing within it two separate and distinct categories of verbal statements, one of which is truly an exception to the hearsay rule and the other

of which is not, the two being admissible in evidence under different principles. Wigmore on Evidence, § 1767 (Vol. VI, p. 182). When the utterance of certain words constitutes or is part of the details of an act, occurrence or transaction which in itself is relevant and provable, the utterance may be proved as a verbal act, just as may be a visual observation of an event. This is not hearsay evidence; it is not admitted for the purpose of proving the truth of what was said, but for the purpose of describing the relevant details of what took place. One of the several qualifications for admissibility of this type of statement is that "the words must be contemporaneous with the conduct, or, in the usual phrase, must accompany the act." Id., § 1776 (Vol. VI, p. 197).

█ The character of utterance that is admissible as a genuine exception to the hearsay rule, also under the customary label of "res gestae," is a spontaneous exclamation, which may or may not be exactly contemporaneous with the provable act or event. Id., § 1745 et seq. (Vol. VI, pp. 131 et seq.). See Norton's Adm'r v. Winstead, 218 Ky. 488, 291 S.W. 723 (1927). See also note, Res Gestae in Kentucky, by H. E. Edmonds, 39 Ky.L.J. 200 (1950–51). "The typical case presented is a *statement or exclamation, by a participant, immediately after an injury, declaring the circumstances of the injury,* or *by a person present* at an affray, a railroad collision, or *other exciting occasion,* asserting the circumstances of it as observed by him." Wigmore on Evidence, § 1746 (Vol. VI. p. 134). This type of statement is received in a testimonial capacity, as evidence of the truth of the fact asserted. Ibid.

█ "It will be seen that these two classes of statements or exclamations are based on very different principles, and that the question of their admissibility must be determined by the principles applicable to the class within which they fall. * * * The true test in spontaneous exclamations is not when the exclamation was made, but whether under all the circumstances of the

particular exclamation the speaker may be considered as speaking under the stress of nervous excitement and shock produced by the act in issue, or whether that nervous excitement has died away," etc. Keefe v. State, 50 Ariz. 293, 72 P.2d 425, 427 (1937).

"This general principle is based on the experience that, under certain external circumstances of physical shock, a stress of nervous excitement may be produced which stills the reflective faculties and removes their control, so that the utterance which then occurs is a spontaneous and sincere response to the actual sensations and perceptions already produced by the external shock. Since this utterance is made under the immediate and uncontrolled domination of the senses, and during the brief period when considerations of self-interest could not have been brought fully to bear by reasoned reflection, the utterance may be taken as particularly trustworthy (or, at least, as lacking the usual grounds of untrustworthiness), and thus as expressing the real tenor of the speaker's belief as to the facts just observed by him; and may therefore be received as testimony to those facts." Wigmore on Evidence, § 1747 (Vol. VI, p. 135).

Under the genuine "verbal act" doctrine the conduct and the verbal utterances must be by the same person, but under the spontaneous exclamation exception to the hearsay rule, "that nervous excitement which renders an utterance admissible may exist equally for a mere *bystander* as well as for the injured or injuring person, and therefore the utterances of either, concerning what they observed, are equally admissible." Id., § 1755 (Vol. VI, pp. 159–160), citing Kentucky decisions at footnote 2. The admissibility of what Powers and Kelly, or either of them, said to Blanton immediately following the robbery must, of course, be determined under the spontaneous exclamation exception to the hearsay rule. Thus it is unnecessary to consider whether they were participants or bystanders. See, however, Hemphill v. Commonwealth, Ky., 379 S.W.2d 223, 228 (1964).

The facts are not far different from those in Daws v. Commonwealth, 314 Ky. 265, 234 S.W.2d 953 (1950), in which the defendant was on trial for shooting at one Daulton with intent to kill. The incident occurred at a place 100 to 125 yards from a church. Daulton drove his truck on to the church and told several persons the defendant had shot at him. According to the opinion reversing a judgment of conviction, Daulton's statement was made "after he had driven slowly in his truck 100 to 125 yards from the place of the shooting to the Church *and after he had been at the church for three minutes."* (Emphasis added.) Hence it was held inadmissible, being neither spontaneous nor contemporaneous with the shooting. The case was distinguished from Norton's Adm'r v. Winstead, 218 Ky. 488, 291 S.W. 723 (1927), which involved about the same time lapse, on the ground that in the latter case the statement was made at the place of the shooting. On that basis, this case is more like the *Norton* case, in that the statement or statements identifying the appellants were made at the scene of the crime.

In Barton v. Commonwealth, 238 Ky. 356, 38 S.W.2d 218 (1913), on which the court relied in the *Daws* opinion, a statement made by the victim of an assault within three minutes after he had been beaten, and only 39 steps away from the place where the offense had been committed, was held inadmissible. As in *Daws,* the statement was not made right at the scene of the crime, but the court today is unwilling to draw such a tenuous distinction. Actually the *Norton* and *Barton* opinions appear to be in substantial conflict, *Daws* notwithstanding. And see Louisville & N. R. Co. v. Molloy's Adm'x, 122 Ky. 219, 91 S.W. 685, 688, 28 Ky.Law Rep. 1113 (1906), which also appears inconsistent with *Barton.*

■ The length of time between the event and the statement, and the distance between the scene of the event and the place where the statement was uttered, can have significance only insofar as they bear on the question of spontaneity. It is our conclusion that although the *Daws* opinion may have been justified on the theory that Daulton's statement was not spontaneous (because it was not made immediately upon his arrival at the church), the *Barton* decision was too restrictive and is unsound. Accordingly, we are of the view in the case now before us that whatever statements Powers or Kelly made to Blanton when he returned to the house following the departure of his assailants came so closely after the event that the possibility of their being fabrications, and not genuine observations, is most unlikely. The evidence does not disclose precisely how many minutes or seconds elapsed, but that kind of an estimate often is inaccurate anyway. He did return immediately, and as soon as the coast was clear. It could not have been many minutes. We hold the evidence admissible.

■ Appellants contend also that Powers should not have been allowed to relate (a) what was said to him by Kelly when they came out of the house and got in the car and (b) what was said and done by the unidentified man standing at the corner of the house. The first of these items of evidence clearly was admissible under the principles we have already discussed, and just as obviously the second was admissible as being merely descriptive of a part of the main event itself, the robbery (the man at the corner of the house being one of the participating actors).

Blanton's son was permitted to testify, but without disclosing the names mentioned, that his father, Powers and Kelly all three told him at the time who had committed the robbery. The state trooper who responded to Blanton's telephone call also was permitted to give similar testimony, during which he mentioned the appellant Caldwell as one of those identified. With respect to Blanton and Powers, who had appeared as witnesses, we are of the opinion

that this evidence was competent on the following theory:

"Ordinarily, when a witness is asked to *identify* the assailant, or thief, or other person who is the subject of his testimony, the witness' act of pointing out the accused (or other person), then and there in the court-room, is of little testimonial force. After all that has intervened, it would seldom happen that the witness would not have come to believe in the person's identity. The failure to recognize would tell for the accused; but the affirmative recognition might mean little against him.

"The psychology of the situation is practically the same as when Recent Contrivance is alleged. To corroborate the witness, therefore, it is entirely proper \* \* \* to prove that *at a former time,* when the suggestions of others could not have intervened to create a fancied recognition in the witness' mind, he recognized and declared the present accused to be the person. \* \* \* This is a simple dictate of common sense, and was never doubted in orthodox practice. That some modern courts are on record for rejecting such evidence is a telling illustration of the power of a technical rule of thumb to paralyze the judicial nerves of natural reasoning." Wigmore on Evidence, § 1130, (Vol. IV, pp. 208–210).

The cases decided by this court prior to Colbert v. Commonwealth, Ky., 306 S.W.2d 825, 71 A.L.R.2d 442 (1957), appear uniformly to have taken the view that unless they fell within the "res gestae," and with certain other special exceptions, extrajudicial identifying statements were not admissible in evidence. See, for example, Edwards v. Commonwealth, 145 Ky. 560, 140 S.W. 1046 (1911); Gilbert v. Commonwealth, 221 Ky. 692, 299 S.W. 569 (1927); Griffith v. Commonwealth, 250 Ky. 506, 63 S.W.2d 594 (1933); Kesterson v. Commonwealth, 254 Ky. 287, 71 S.W.2d 622 (1934); Keene v. Commonwealth, 307 Ky. 308, 210 S.W.2d 926 (1948); and Daniels v. Commonwealth, Ky., 269 S.W.2d 705 (1954). The types of evidence held inadmissible included (1) testimony of the witness himself that he had made the identifying statement, (2) testimony of the persons to whom the witness had made the statement, or who heard him make it, and (3) testimony to the effect that some person not a witness at the trial had made such a statement. Overruling previous decisions to the contrary, the *Colbert* opinion held "that evidence by a witness of his own previous identification of the defendant in a criminal case, under circumstances reasonably free of improper influence, is competent," but that the testimony of another person to the effect that he (the previous witness) had done so is "plain hearsay" and is not competent.

Upon further consideration of the subject, we have come to the conclusion that the distinction drawn in the *Colbert* case, to the effect that a witness may say he made an identifying statement, but another witness who was there when he did it cannot say so, is not tenable. As pointed out by Professor Morgan (Edmund M. Morgan, Hearsay Dangers and the Application of the Hearsay Concept, 62 Harv.L.Rev. 177, 196, Dec.1948), if the person who made the identifying statement appears as a witness and testifies that the statement was true, "then the only debatable question is whether he made the statement; and as to that the trier has all the witnesses before him, and has also the benefit of thorough cross-examination as to the facts which are the subject matter of the statement." Once a witness is allowed to testify that he made an identifying statement, further proof by other witnesses that he did in fact make it is just as relevant and competent as would be defensive proof to the effect that he did not make it. To the extent, therefore, that it holds such corroborative proof by other witnesses inadmissible, Colbert v. Commonwealth, Ky., 306 S.W.2d 825, 71 A.L.R.2d 442, 448 (1957), is overruled.

In this case the question of identity was vital. As it developed, the defense was based to a great extent on the theory of a frame-up designed and contrived by Blanton after he had been beaten up, not by either of the appellants, but by Ronnie Preston, brother of the appellant Britton Preston. That those present at the scene of the crime made prompt identifications had important corroborative value, and was admissible. With respect to Kelly, who had not testified and thus was not subject to cross-examination, it was incompetent, and particularly so in that the trooper said Kelly was the one who identified Caldwell. Nevertheless, since both Blanton and Powers had named Caldwell anyway, and since Kelly's spontaneous identification of Preston had already been introduced through Blanton, we do not believe this testimony, though technically inadmissible, could have had any further prejudicial effect against the appellants.

The trooper also was allowed to testify that a warrant for the arrest of the appellants was sworn out by Blanton, and that he (the trooper) relayed this information to other officers in Magoffin County for the purpose of effecting arrests. The other officers then testified that, having been so advised, they saw the appellants come through Salyersville and gave chase, though unsuccessfully. One of these officers testified that on the same night a taxi driver named Slusher made a complaint, and Slusher then followed with testimony that on the night he made his complaint (he could not give the date) he had encountered the appellants in the vicinity of Blanton's home and they apparently had tried to rob him.

Blanton having testified that he did swear out the warrant against the appellants, we can see nothing improper in the trooper's explaining how the officers in Salyersville happened to be on the lookout for them. The existence of a warrant necessarily implies that someone had made an accusation. In this particular connection, none of the officers undertook to recite any details of what they heard from others except for the fact that there was a warrant, taken out by Blanton, for the arrest of the appellants, which warrant they sought to and ultimately did execute. We find no error in that respect.

That Slusher could not give the date of the incident about which he testified was not fatal, because the time had been established by one of the officers present when he reported it. Cf. Hoskins v. Commonwealth, Ky., 374 S.W.2d 839, 843 (1964).

The one incident during the trial that has given us the most difficulty in this review occurred during Slusher's appearance on the witness stand, when the appellant Britton Preston interrupted as follows: "How much did Blanton pay you to say this?" Without calling a recess and taking the matter up in chambers, as would have been the better practice, the court at once announced, "You are fined $30.00 and 24 hours in jail for your outburst. Go ahead."

It was emphasized in Merritt v. Commonwealth, Ky., 386 S.W.2d 727, 730–731 (1965), that a judge must not do or say anything to suggest his personal attitudes relative to the parties, the attorneys, or the case being tried. We realize that some courts might feel disposed to treat a contempt ruling in the presence of the jury as presumptively falling in this proscribed category, but we do not believe it is necessarily so. The judge has both the right and duty to preserve decorum, and to do it promptly and publicly when it appears reasonably necessary or appropriate. He must have a wide discretion in this regard, and he is in the best position to determine what course of action is indicated by the attendant circumstances. Respect for the court depends to a great extent on what the public, as well as the participants, is able to see and hear during the course of a trial. We take judicial notice that the progress of law and

order over violence and vendetta has been a long and uphill fight in some parts of the country, including the general area in which this case finds its setting. This was a bitterly-fought controversy with obvious undertones of eruptive hostility. On a review of the whole proceeding we are not persuaded that the action of the trial court was improper. Nor, for that matter, do we find it prejudicial either. The judge did not indicate any feeling toward Preston or the merits of the case, and the record does not disclose any discernible basis on which a reasonably intelligent jury could have inferred that he did.

"A trial court may punish for contempt of court if necessary, even in the presence of the jury. * * * Not every utterance of doubtful propriety made by the court during the course of the trial results in prejudice, and whether the defendant's rights were violated must be determined from the whole record." State v. Ross, Mo., 371 S.W.2d 224, 228 (1963).

The rest of the criticisms sown broadcast across the pages of appellants' brief are of less substance than those we have thus far discussed. It is true that many of the trial court's rulings on objections were so laconic as to be unintelligible or at least inconclusive. However, in most instances the evidence was admissible anyway, and the objections were not well taken. Some of the questions asked by the Commonwealth's Attorney were improper (so were many of those asked by the defense), but in each of the instances cited in the brief the objections were sustained and the questions went unanswered. The various comments made by the court, such as "This is prejudicial testimony" (in sustaining an objection to evidence offered by the defense), "I will permit that, but it is a little off, and I can't see how it has much bearing" (in overruling an objection to defense testimony), and "So is Johnson County; supposed to be" (remarked when appellants' attorney, objecting to interrogation of one of the defense witnesses as to why he had to come over to Johnson County from Magoffin County to buy whiskey, said, "Objection to that. Magoffin County is dry. We object to that") may have been unnecessary, but neither singly nor as a whole do they suggest any real prejudice to the appellants' case.

The one comment made by the trial court which comes nearest to being improper occurred during the questioning of Ronnie Preston, who claimed that it was he who had the encounter with Blanton on the night in question. His story was that he had bought some moonshine whiskey from Blanton and that Blanton could not or would not give him change for a $20 bill. This is what happened at the trial:

Q—"Did an argument ensue between you and him then about the change?"

A—"That's right."

Q—"What was the result of it?"

A—"I just beat the living hell out of him."

BY MR. TACKETT: "Now, don't talk that way on the witness stand."

BY THE COURT: "I will put you everyone in jail if I have to, that type of talk will be hushed here; you can talk like a gentleman, if you know how to talk like one."

Again, however, our reaction is that in the interest of maintaining order in his court the trial judge was within his rights in giving the foregoing admonition.

In conclusion, we find in this record no errors affecting the substantial rights of either of the appellants.

The judgment is affirmed.