**M. N. ALEXANDER, Appellant,**

**v.**

**COMMONWEALTH of Kentucky, Appellee.**

Court of Appeals of Kentucky.

Feb. 12, 1971.

Joseph J. Grace, Paducah, for appellant.

John B. Breckinridge, Atty. Gen., M. Curran Clem, Asst. Atty. Gen., for appellee.

PALMORE, Judge.

The appellant, M. N. Alexander, was found guilty of knowingly receiving stolen property and sentenced to two years in the penitentiary. KRS 433.290, 433.220. In this appeal he claims prejudicial error by the trial court in (1) permitting part of a tape recording of certain testimony from a previous trial to be read at the last trial and (2) overruling his motion to discharge the jury because of improper questions propounded by the attorney for the Commonwealth. We find no error in either respect.

The property Alexander is alleged to have received consisted of a set of Mercury dimes stolen from the home of Mrs. M. M. Livingston in April of 1967. Mrs. Livingston saw the collection on display at Paducah in November of 1968, and it was traced to Alexander, resulting in the in-

dictment. Alexander's defense was that the dimes so discovered had been collected by him over a period of several years and were not the ones stolen from the Livingston home. The first trial resulted in a hung jury.

Mrs. Livingston's testimony identifying this particular collection of coins was, of course, vital.[1] Some of the particular coins were more rare and easier to identify than others. One of these was what is known as a 1916D, connoting that it was minted at Denver in 1916. Mrs. Livingston was able to recognize it by a slight scratch on one side running downward from the letter "Y" in "LIBERTY". When Alexander took the stand in his own defense and counsel offered him the plaque of coins he replied to the effect that he would like to identify some of the coins from memory, without looking at the plaque (explaining later that although he had seen the plaque at the first trial he had not had a close enough look to inspect any of the coins individually for characteristic markings). He then proceeded to describe the 1916D dime as it had been theretofore described by Mrs. Livingston, but with one additional feature—that his dime also had a center punch mark on the rim under the "9". We continue with his testimony as follows:

Q. "It has a what?"

A. "It has a center punch and it has been hit. I didn't look at the plaque and if it is still there, the coin is mine."

Q. "You heard all these experts testify this morning, didn't you?"

A. "Yes, sir, I did."

Q. "Did you hear any of them say anything about a punch hole on that?"

A. "No, sir."

Q. "Is there one there on it?"

A. "If one is on it, that's my dime."

Q. "If that's your dime, there is a punch—

A. "Although there can be other dimes with center punches. I am not saying there can't be, I am not saying that at all and I am not trying to describe the dime, but if that one has a center punch—

Q. "All right, but you had a dime with a center punch under there?"

A. "Yes, sir."

Q. "Show the jury and make a little round mark where that was."

A. "It would be right under—on this rim (indicating). This rim would be distorted, it's right down on the rim, right under the nine."

Q. "Now you heard the expert testify and look at this and examine it carefully, and you heard Mrs. Livingston talk about it. Did you hear her say anything about any center punch on there?"

A. "I didn't hear anyone say anything about it."

Q. "Is there one there?"

A. "There is one there."

Q. "Come over here and look at this plaque of dimes and see if you can find it."

A. (Witness goes to look at plague.) "Yes, sir, I see it. Very distinct. See it right there?"

MR. GRACE: (Looks at plaque.) "I can see it. I'll ask the gentleman sitting beside you (looking at Commonwealth Attorney) would he please come over here and will he disagree or agree it is, for me?"

MR. JONES: "You are probably right. Go ahead and finish examining him."

---

1. Cf. Alexander v. Commonwealth, Ky., 457 S.W.2d 472 (1970).

MR. SCHROEDER: "I saw it in the last trial. It was brought out in the last trial." [Schroeder was an expert witness for the Commonwealth.]

MR. GRACE: "You didn't say anything about it today though, did you?"

MR. SCHROEDER: "No, I forgot it, but it was drawn on the board in the last trial."

MR. GRACE: "Well, they didn't draw it on the board today."

and on cross-examination:

Q. "Well, is there different grades in circulation?"

A. "Some are very, very—since I have been looking at this here in Court and trying to grade this through here and looking at the scratch marks and identifying it and looking at it, they missed the one on the rim."

Q. "Beg pardon?"

A. "They missed the marking on the rim because they didn't know it was there, see."

Q. "Who missed the marking on the rim?"

A. "Whoever has been looking at these things."

Q. "You mean, until today, you have never heard anything about that little marking on that rim?"

A. "Not a center punch marking on the rim, and that's what this is."

Q. "Beg pardon?"

A. "Not a center punch marking on the rim, and that's what this is."

Q. "You have never heard about a marking on the rim of the 1916D?"

A. "I don't recall it, no, sir."

Q. "You have never heard of it in this courtroom before?"

A. "I don't recall anybody saying anything about a marking on the nine, on the 1916D, has a center punch marking. I just don't recall it."

\* \* \* \* \* \*

Q. "I am going to ask you, Alexander, when you were here—have you ever heard testimony in this courtroom about the mark on that dime before today?"

A. "Yes, I heard testimony about the mark on the dime that—

Q. "I am talking about the mark on the rim?"

A. "Not on the '16D. I don't recall it at all."

Q. "Well, do you or don't you—have you heard it, or you don't remember?"

A. "I don't remember it."

Q. "You don't remember, all right. You can't say you have and you can't say you haven't, is that right?"

A. "I can say I don't remember of ever hearing it."

Had it been true that Alexander had not theretofore examined the coins, and that Mrs. Livingston had never mentioned the punch mark on the rim of the 1916D dime, Alexander's testimony quoted above might have had considerable impact. But the ruse, if it was a ruse, failed. Actually Mrs. Livingston had described the mark at the earlier trial, and it was for the purpose of proving this fact that the trial court allowed the jury to hear that portion of her testimony from the other trial as recorded on tape under the supervision of the official court reporter. Later, on the Commonwealth's rebuttal, Mrs. Livingston explained that she had forgotten about the punch mark (which she called a "little nick") while giving her most recent testimony.

We see nothing improper in the admission of the recording, though perhaps

it would have been preferable to defer its introduction until the Commonwealth's rebuttal at the conclusion of the defense testimony. The strictures of KRS 422.150 and RCr 7.20 and 7.22 are not applicable, because the recording was introduced not for the purpose of proving the truth of *what* was said, but only to prove that it *was said,* rebutting Alexander's suggestion that it had not been said. Had Alexander requested an admonition limiting it to that effect he would have been entitled to it. Moreover, since it is an accepted principle that the testimony of a witness identifying a person or thing may be corroborated by evidence of his having done so at an earlier time, it seems to us that the same logic applies when the identification of a piece of property is called into question. Cf. Preston v. Commonwealth, Ky., 406 S.W.2d 398, 403, 29 A.L.R.2d 1387 (1966).

The interrogation of which Alexander complains is the italicized portion of the following excerpt from the transcript:

Q. *"Now, I want to ask you whether or not you received these dimes, this Mercury dime collection, and then transported it and gave it to other parties here in Paducah for purposes of sale, did you do that?"*

A. "No."

Q. *"Did you go to Bill Mathis' place out near Reidland and obtain from him the location of these coins that you had delivered to him previously, that Mercury dime set right there?"*

MR. GRACE: "I object, if the Court please."

A. "I don't remember."

MR. GRACE: "This is contradictory—

WITNESS: "This is my Mercury dime set—

MR. GRACE: "Wait a minute—

COURT: "Just a minute. Of course, there is no basis for your statement at this time—

MR. GRACE: "Nothing in this record about it."

WITNESS: "I am not going to go for it either."

MR. GRACE: "Wait a minute, let the Court rule on that."

COURT: "I'll sustain the objection."

MR. JONES: "That's all right."

Q. *"Now Mr. Alexander, isn't it true that on May 17, 1969, your place was dynamited because you wouldn't return those coins?"*

MR. GRACE: "I object."

COURT: "Just a second."

MR. GRACE: "That's ridiculous."

MR. JONES: "It is not ridiculous."

MR. GRACE: "That is absolutely ridiculous. We have gone clear out—this man is on cross-examination."

MR. JONES: "We haven't gone out of a thing, I just want the truth."

MR. GRACE: "Sure, you have made the statement everybody ought to be in the penitentiary, that's what you made."

COURT: "Come up here, Mr. Jones."

CONFERENCE AT THE BENCH

MR. GRACE: "I want to make a motion for a mistrial at this time."

COURT: "I'll overrule your motion and I'll admonish the jury not to consider for any purpose the question asked by Mr. Jones."

MR. JONES: "I have no further question to ask this witness."

MR. GRACE: "After such a display as that?"

MR. JONES: "If the Court please, I object to Mr. Grace's—

COURT: "Go ahead."

MR. GRACE: "I am not going to examine this man any further. He has been mistreated and the Court knows it."

COURT: "Go ahead, and let the witness step down."

The argument is that these questions were asked for the purpose of imparting or suggesting prejudicial information to the jury that could not be introduced in evidence, and that neither Alexander's replies nor the court's admonition could assuage their harmful effect.

"The attorney for the Commonwealth may not deliberately inject into the case an issue prejudicial to the rights of defendant without some reasonable basis for the questions." Rowe v. Commonwealth, Ky., 269 S.W.2d 247, 249 (1954). In Woodford v. Commonwealth, Ky., 376 S.W.2d 526, 528 (1964), it was held that repeated questions concerning a chase by a police car had injected a false issue which was highly prejudicial. "Such conduct is inexcusable and unbecoming in an officer of the court whose duty is to see that a defendant is dealt with fairly and that his legal rights, as well as those of the Commonwealth's, are fully protected. * * * After appellant answered in the negative, the continued questioning permitted by the court on the same matter was reversible error." *Ibid.*

In this instance we do not have much concern about the first two questions. After all, the function of cross-examination is such that some allowance must be made for probing in the dark, as well as for the hope that the witness may admit the truth of something counsel has heard or knows but may not be able to prove. To require that he know the answers in advance, and be ready to refute false answers with competent evidence, would severely restrict the value of cross-examination. The scope of investigative probing during the course of cross-examination must be circumscribed by a criterion of fairness and good faith rather than the questioner's ability to come up with a ready impeachment or rebuttal.

■ On its face the first question certainly was not improper, and was not objected to. The second question, being more specific, may have served to refresh Alexander's recollection after he had answered the more general first question in the negative. As a matter of fact, it appears to us that it did. Alexander said he did not remember. The jury could well have thought it strange that he could not remember whether such an event had taken place, giving rise to the inference that it really did. We therefore do not believe the second question was improper either, but even if it had been, it would not have amounted to the degree of persistence denounced by our cases on the subject. See Wooten v. Commonwealth, 299 Ky. 598, 186 S.W.2d 652, 655 (1945).

■ It is the last question that gives concern, because it was clearly out of bounds and improper, and we do not condone it. Nevertheless, due regard must be accorded the trial court's admonition to the jury not to consider it for any purpose. Although the question may have aroused the curiosity of the jurors, it did not introduce an element likely to inflame them or to incite prejudice against Alexander and thus be likely to override the efficacy of an admonition. Viewing it against the background of all the evidence in the case, we are of the opinion that the prospect of its having produced substantial prejudice is too remote to justify a reversal of the conviction.

It appears that counsel for Alexander has represented him by appointment of the trial court, and he has done so with a zeal and competence that merits commendation.

The judgment is affirmed.

All concur.