**Charles ALLEN, Appellant,**

v.

**COMMONWEALTH of Kentucky, Appellee.**

No. 2008–SC–000009–MR.

Supreme Court of Kentucky.

June 25, 2009.

Shannon Renee Dupree, Assistant Public Advocate, Department of Public Advocacy, Frankfort, KY, Counsel for Appellant.

Jack Conway, Attorney General of Kentucky, Bryan Darwin Morrow, Office of the Attorney General, Frankfort, KY, Counsel for Appellee.

Opinion of the Court by Chief Justice MINTON.

During jury selection, members of the murder victim's family appeared in the courtroom wearing t-shirts imprinted with a photograph of the victim and the words, "In loving memory." Charles Allen, who was on trial for the murder, argues that the trial court erred when it refused to discharge the entire venire following the t-shirt display. Raising this and other issues, Allen contends that he did not receive a fair trial and that we should re-

verse his wanton murder conviction and sentence.

We decline to hold that this display of message-bearing clothing requires automatic reversal. Instead, we conclude that the best course in these situations is for the trial court to determine, as it did here, whether the attendees' display caused the defendant any tangible prejudice. Finding no reversible errors in any of the issues Allen raises on appeal, we affirm.

## I. FACTS AND PROCEDURAL HISTORY.

Allen permitted Chad Brown, the nephew of his girlfriend, to store a mobile home on Allen's property while Brown was incarcerated. Brown eventually sold the mobile home and told Allen he would pay him a $50 storage fee. Allen rejected Brown's offer of a partial payment and an offer of full payment from Brown's grandfather, instead insisting that Brown pay the full $50 himself. After the mobile home was moved, Allen went to a friend's house and complained about Brown's failure to pay the full $50, remarking that someone needed to get a "pine box" ready for Brown.

Later that day, Allen went to Brown's residence, armed with a gun. An altercation ensued between Brown and Allen; and the gun discharged, wounding Brown. Relatives of Brown stated that they heard Allen say something like, "I meant to kill you, you son of a bitch," to Brown before driving away.

Brown died from the gunshot wound. Allen eventually turned himself in to the authorities. After being informed of his rights, Allen told the authorities that the shooting of Brown was an accident. Deputy Bocook asked Allen why he was not injured if the gun went off while it was in Allen's waistband. Allen then invoked his rights to silence and to an attorney.

Allen was indicted for murder, and the case proceeded to jury trial. Apparently not satisfied by Allen's insistence that the shooting of Brown was purely accidental, the jury found Allen guilty of wanton murder and recommended the minimum sentence of twenty years' imprisonment.[1] The trial court sentenced Allen in accordance with the jury's recommendation, after which Allen filed this matter-of-right appeal.[2]

## II. ANALYSIS.

Allen raises five issues on appeal. First, he argues that the trial court improperly permitted Detective Bocook to give opinion testimony. Second, he argues Detective Bocook improperly commented on Allen's invocation of his right to remain silent. Third, he contends that his right to a fair trial was denied when members of the victim's family appeared on the opening day of trial wearing shirts bearing Brown's picture. Fourth, Allen contends that certain comments by the trial court deprived him of a fair trial. Finally, Allen argues

1. Allen and the Commonwealth agree that Allen was found guilty of wanton murder. Upon our review of the record, the jury found Allen guilty of murder "under instruction number 1.B." Instruction 1, however, dealt only with the presumption of innocence and did not contain a subsection B. Instruction 3 permitted the jury to find Allen guilty of intentional murder under section (B)(1) or wanton murder under section (B)(2). So the jury's finding of guilt under instruction 1.B. is illogical But review of the record revealed that in

answer to oral questioning from the trial court, the foreperson of the jury orally stated that the jury had unanimously found Allen guilty of wanton murder. Allen's counsel declined the trial court's invitation to poll the jurors. No party has raised the discrepancy on the written jury verdict form. So we assume Allen was found guilty of wanton murder.

2. Ky. Const. § 110(2)(b).

the trial court erred by permitting improper bolstering of the testimony of two witnesses who were related to Brown. We find no reversible error in any of Allen's arguments.

A. *No Error in Admitting Bocook's Alleged Opinion Testimony.*

█ The central issue in this case was whether the jury would accept the Commonwealth's theory that Allen intentionally shot Brown or whether the jury would accept Allen's contention that the shooting of Brown was accidental. To buttress its intentional shooting theory, the Commonwealth played—without objection—the videotape of Allen's interview with the authorities. In that interview, Bocook asked Allen why he had not been shot if the gun was in his pants when it discharged. Allen replied by stating that he did not shoot Brown and would not have intentionally hurt him.

During cross-examination of Bocook, Allen's counsel repeatedly asked why Bocook had not taken a picture of a purported scratch or bruise under Allen's eye. Bocook responded that he had seen the obvious abrasion but had not photographed it because Allen had not cooperated fully. At one point, Allen's counsel stated, "when you [Bocook] accused him of something, he [Allen] quit [cooperating]," to which Bocook responded that Allen "quit when the questions became harder."

On redirect, the Commonwealth asked Bocook what the last question Bocook had posited to Allen on the video had been, to which Bocook non-responsively replied, "[i]t was that, uh, he had stated that he had stuck the gun in his pants; and when the questions became harder and more objectionable questions. . . ." The Commonwealth again asked what the question was that Bocook believed had been objectionable to Allen, to which Bocook began his response by stating, "[c]ommon sense

would," at which point Allen objected without elaboration. The trial court then instructed Bocook to state the question he had asked Allen and not to offer his opinion. Bocook then stated that the so-called question was, "[I]f you fell down with the gun in your pants[,] you should be the victim then. The gun should have shot you in the leg." Shortly thereafter, the Commonwealth asked Bocook if that was the last question, to which Bocook responded in the affirmative. The Commonwealth again asked whether Allen had responded to the question, to which Bocook answered in the negative.

Allen argues that Bocook was improperly permitted to offer opinion testimony that Brown's injuries could not have happened as Allen claimed. This issue is questionably preserved at best. A tape of Allen making a statement and being questioned by the police was played for the jury without objection. The tape included Bocook asking Allen why he had not been shot if the gun was in his pants when it discharged. So Allen's objection, which was not lodged until the Commonwealth's redirect examination of Bocook, was tardy. Because counsel stated no grounds for the objection, we cannot be sure that the reason for the objection below is the same ground being raised on appeal. But Allen is not entitled to relief even if we assume, for purposes of argument, this issue is properly preserved.

█ Allen's objection was sustained by the trial court. However, Allen did not renew his objection or request additional relief when Bocook testified that his last question to Allen was why Allen had not been shot if the gun discharged while it was in Allen's pants. Our precedent holds that a failure to request an admonition after an objection had been sustained

means that "no error occurred."[3] We reject Allen's contention, unsupported by citation to authority, that "there is a significant distinction between Appellant's videotaped statement and the trial court testimony," solely because Bocook was acting in an investigative role during the proceedings captured on the videotape but was a witness for the Commonwealth during the trial. The same essential questions and concerns were raised by Bocook on the tape and in the witness chair.

Moreover, during cross-examination, Allen's counsel stated to Bocook that "when you started accusing him of something, he quit." So the Commonwealth was properly permitted on cross-examination to ask Bocook about the question in which he allegedly accused Allen of committing a crime. Additionally, although it is generally improper for one witness to accuse another witness of lying,[4] it is not always inherently improper for a police officer questioning a suspect (who has been fully informed of his rights) about holes or potential falsehoods in that suspect's theory of events in an effort to get the suspect to tell the complete truth.[5] On balance, having fully considered the evidence and context of Bocook's testimony, we find no abuse of discretion by the trial court in permitting the admission of the testimony in question.[6]

**B.** *No Palpable Error in Bocook's Comments Upon Allen's Invocation of His Right to Remain Silent.*

 In a somewhat interrelated argument, Allen contends that Bocook was improperly permitted to comment upon Allen's invocation of his right to remain silent. Since Allen admits this issue is unpreserved, we may reverse only if any error is palpable.[7] An error is palpable only if it is "shocking or jurisprudentially intolerable."[8] In order to demonstrate an error rises to the level of a palpable error, the party claiming palpable error must show a "probability of a different result or [an] error so fundamental as to threaten a defendant's entitlement to due process of law."[9]

As stated before, during cross-examination, Allen's counsel asked Bocook why he had not taken photos of, or inquired about, scratches around Allen's eye. Bocook responded by saying that he had seen the scratch but had not taken a picture of it because Allen "refused to continue to cooperate with investigators." Later, Allen's

3. *Soto v. Commonwealth,* 139 S.W.3d 827, 861 (Ky.2004).

4. *Moss v. Commonwealth,* 949 S.W.2d 579, 583 (Ky.1997).

5. *Cf. Lanham v. Commonwealth,* 171 S.W.3d 14, 27 (Ky.2005) (holding admissible an officer's repeated statements to a suspect during a videotaped interview that the officer believed the suspect was lying because those types of "comments are part of an interrogation technique aimed at showing the defendant that the officer recognizes the holes and contradictions in the defendant's story, thus urging him or her to tell the truth.").

6. *See, e.g., Brewer v. Commonwealth,* 206 S.W.3d 313, 320 (Ky.2006) ("An appellate court's standard of review for admission of evidence is whether the trial court abused its discretion.").

7. Kentucky Rules of Criminal Procedure (RCr) 10.26 ("A palpable error which affects the substantial rights of a party may be considered by the court on motion for a new trial or by an appellate court on appeal, even though insufficiently raised or preserved for review, and appropriate relief may be granted upon a determination that manifest injustice has resulted from the error.").

8. *Martin v. Commonwealth,* 207 S.W.3d 1, 4 (Ky.2006).

9. *Id.* at 3.

counsel asked Bocook why he had not asked Allen how he got the scratch(es), to which Bocook repeated that he had not done so because Allen had refused to continue to cooperate. Allen's counsel and Bocook engaged in a similar dialogue again later during cross-examination about Allen's invocation of his right to silence (*i.e.,* Allen's refusal to continue to cooperate with Bocook after having initially cooperated).

This case is remarkably similar to the recent case of *Coulthard v. Commonwealth.*[10] In *Coulthard,* the following exchange between a detective and a defendant's attorney took place during cross-examination:

Q. Now, you did have a couple of interviews with [Appellant], did you ever ask if there was anyone sitting in the vehicle with him?

A. No.

Q. You did not?

A. No.

Q. Did you ask Starla if there was anyone sitting in the vehicle, if she knew?

A. Yes.

Q. You did?

A. Yes, May 19th, May 19th.

Q. But in both interviews with [Appellant] you never asked him that?

A. He had no knowledge of how Brian Brown was killed.

Q. Okay. So you took it upon yourself to not ask that question then?

A. **He refused to talk to me the second time.**

Q. **The first time he talked to you?**

A. **Yes.**[11]

As Allen does now, Coulthard argued that the detective's statement regarding Coulthard's refusal to talk a second time to police was an unconstitutional, improper comment upon his right to silence. We disagreed, holding that "[t]he detective's comment was in fair and direct response to questioning by Appellant's attorney."[12] Likewise, in the case at hand, Bocook's references to Allen's silence responded to Allen's counsel's persistent questions. In other words, to combat Allen's counsel's argument that Bocook had not performed a proper investigation, Bocook attempted to explain that Allen's refusal to cooperate was the reason he had not taken photos of the scratch near Allen's eye. And since Allen's counsel asked questions that led Bocook to testify that he did not photograph or inquire about the scratch(es) or swelling near Allen's eyes because Allen refused to cooperate, it was not improper for the Commonwealth to ask Bocook on redirect examination about the last question Bocook had asked Allen before Allen ceased cooperating. So we do not find that Bocook's references to Allen's lack of cooperation or invocation of his right to silence rise to the level of palpable error.

C. *Allen's Right to a Fair Trial Was Not Denied When Members of Brown's Family Wore Shirts Showing a Photo of Brown.*

■ The parties agree that at least once during jury selection, Brown's father and brother appeared in the courtroom wearing t-shirts containing the words, "In loving memory," and displaying Brown's image. And, for at least a short period of time, one of Brown's relatives wearing the t-shirt was spotted during a recess inside the bar in the area reserved for counsel and the defendant. The trial court denied

---

10. 230 S.W.3d 572 (Ky.2007).

11. *Id.* at 585 (emphasis added).

12. *Id.*

Allen's motion to discharge the entire venire and permitted Allen's attorney to question veniremembers during voir dire about the effect, if any, the t-shirts would have on them. During that questioning, none of the jurors stated that these t-shirts would have any bearing on how they viewed the case. On appeal, Allen contends the trial court's denial of his motion to discharge the entire venire had the effect of denying his right to a fair trial.

After arguing in his initial brief that his counsel had not examined the prospective jurors regarding the t-shirts, Allen admitted in his reply brief that his counsel had conducted such an examination and, thus, requested palpable error review under RCr 10.26. Having once objected to the presence of the t-shirts in the courtroom and requested the dismissal of the venire, we question whether Allen needed again to object in order to reserve the error for review. But our conclusion that Allen is not entitled to relief is unaffected whether or not the issue is deemed preserved.

We recently held in *Coulthard* that a defendant's right to a fair trial was not denied when a trial court refused to bar similar so-called "propaganda" from a courtroom.[13] But, unlike this case, we emphasized in *Coulthard* that the t-shirts in that case had not been worn in the courtroom or viewed by the jury.[14] We noted that Coulthard's "argument could possibly have merit if he were able to cite to any 'propaganda' displayed in the courtroom during the trial or which was viewed by the trial jury at any time."[15] Since the "propaganda" was seen inside the courtroom in the case at hand, we cannot resolve this issue solely by reliance upon *Coulthard.*

Courts have split over whether conduct by message-wearing spectators similar to those in the present case deprived a defendant of the right to a fair trial.[16] Even the United States Supreme Court has recently deemed this issue to be "an open question in our jurisprudence."[17] After careful ex-

**13.** *Coulthard,* 230 S.W.3d at 576.

**14.** *Id.* ("Appellant's argument is based on the alleged presence of such propaganda 'at one time prior to trial' and speculation as to whether cars outside the courthouse contained the aforementioned license plates.").

**15.** *Id.*

**16.** *Compare, e.g., State v. Franklin,* 174 W.Va. 469, 327 S.E.2d 449, 455 (1985) (holding in DUI case that resulted in death that spectators wearing MADD buttons "were clearly distinguishable from other visitors in the courtroom and, led by the sheriff, they constituted a formidable, albeit passive, influence on the jury. Indeed, the court's cardinal failure in this case was to take no action whatever against a predominant group of ordinary citizens who were tooth and nail opposed to any finding that the defendant was not guilty. This Court quite simply cannot state that the mere presence of the spectators wearing MADD buttons and the pressure and activities of the uniformed sheriff leading them did not

do irreparable damage to the defendant's right to a fair trial by an impartial jury. Indeed, it constitutes reversible error.") *with Nguyen v. State,* 977 S.W.2d 450, 457 (Tex. App.1998) ("In the present case, defense counsel objected that seven individuals out of at least twenty-five persons in the courtroom wore the buttons in question. Although defense counsel stated, 'It'll be clearly visible to the jurors,' the record contains no indication where the individuals were sitting, whether they were seated together, or if the jurors did in fact see the buttons from where they were seated. It is impossible to tell from this record whether the buttons even came close to being such an overwhelming presence in the courtroom that it was reasonably probable they influenced the jury's verdict. We conclude that the record here does not demonstrate that the trial court erred in denying Nguyen's request to have the spectators remove the buttons.") (footnote omitted).

**17.** *Carey v. Musladin,* 549 U.S. 70, 76, 127 S.Ct. 649, 166 L.Ed.2d 482 (2006) (holding in post-conviction case that state appellate

amination, we conclude that the wearing of these t-shirts in the courtroom by Brown's family, although improper, did not so infect these proceedings with error to require reversal.

As Justice Souter has wisely noted, "one could not seriously deny that allowing spectators at a criminal trial to wear visible buttons with the victim's photo can raise a risk of improper considerations."[18] Because such displays are "no part of the evidence going to guilt or innocence, and . . . are . . . an appeal for sympathy for the victim . . . and a call for some response from those who see them[,]"[19] we agree with the Supreme Court of Kansas that the wearing of such buttons or clothing by spectators "is not a good idea. . . ."[20] We decline, however, to conclude that the wearing of such clothing or buttons in the courtroom is so inherently unfair as always to constitute reversible error. Such a holding would cause a structural error to

have occurred each time a potential juror caught a fleeting glimpse of a t-shirt or button bearing the likeness of a victim.[21] Instead, we conclude that the best course in these situations is for the trial court to determine if the spectators' display caused the defendant to suffer any tangible prejudice.

Therefore, the trial court appropriately permitted Allen's counsel in this case to inquire during voir dire as to the effect, if any, the t-shirts would have on the veniremembers. Since no veniremember stated that the t-shirts would affect service as a juror, Allen has not suffered any demonstrable prejudice. Likewise, we reject a contention that the t-shirts created a situation of overwhelmingly inherent prejudice.[22] After all, no veniremember claimed to be affected by the t-shirts.[23] We decline to declare, under the facts of this case, that the presence of the t-shirts was so inherently prejudicial as to necessitate

---

court's determination that a habeas petitioner was not inherently prejudiced when spectators wore buttons depicting murder victim was not unreasonable application of clearly established law because, essentially, there was not clearly established law on that issue).

18. *Id.* at 82, 127 S.Ct. 649 (Souter, J., concurring).

19. *Id.* at 82–83, 127 S.Ct. 649 (Souter, J., concurring).

20. *State v. Speed*, 265 Kan. 26, 961 P.2d 13, 30 (1998).

21. *See, e.g., Billings v. Polk*, 441 F.3d 238, 247 (4th Cir.2006) ("These precedents do not clearly establish that a defendant's right to a fair jury trial is violated whenever an article of clothing worn at trial arguably conveys a message about the matter before the jury. It would not be objectively unreasonable to conclude that the jury's exposure to a T-shirt or button that could, but need not necessarily, be construed as conveying a message about the matter before the jury simply does not rise to

the level of a constitutional violation in the way that it does when the court forces the defendant to appear before the jury in prison garb, allows the trial to be influenced or dominated by a mob, or allows the prosecution's key witnesses to have extensive interaction with the jury.").

22. *Carey*, 549 U.S. at 81, 127 S.Ct. 649 (Kennedy, J., concurring) ("In the case before us there is no indication the atmosphere at respondent's trial was one of coercion or intimidation to the severe extent demonstrated in the cases just discussed.").

23. *See, e.g., In re Woods*, 154 Wash.2d 400, 114 P.3d 607, 616 (2005) ("When a courtroom arrangement is challenged as inherently prejudicial, the question to be answered is whether an unacceptable risk is presented of impermissible factors coming into play. *Holbrook v. Flynn*, 475 U.S. 560, 570, 106 S.Ct. 1340, 89 L.Ed.2d 525 (1986). In other words, all a court may do in such a situation is to look at the courtroom scene presented to the jury and determine whether what they saw was so inherently prejudicial as to pose

the extreme remedy of dismissing the venire.

On a related note, Allen emphasizes our dictum in *Coulthard* that Coulthard's argument that the t-shirts portraying the victim's photograph had interfered with his right to a fair trial "could possibly have merit if he [Coulthard] were able to cite to any 'propaganda' displayed in the courtroom during the trial or which was viewed by the trial jury at any time."[24] In *Coulthard*, we stated the obvious: it would have been more difficult to determine whether Coulthard's right to a fair trial had been denied if the so-called propaganda had actually been viewed by the jury in the courtroom. *Coulthard* should not be read to mean that the presence of similar "propaganda" in the courtroom always constitutes reversible error.

■ Before leaving this issue, we note that the judges of this Commonwealth have the inherent authority and discretion to control the decorum and conduct of those in the courtroom to ensure that neither the defendant nor the Commonwealth is denied a fair trial.[25] We realize that busy trial judges cannot always be cognizant of the attire of all attendees in the courtroom, and we also recognize that

courtrooms are generally open to the public. But courtrooms must be "holy shrine[s] of impartiality."[26] So we encourage trial judges in their efforts to prevent trial attendees from conveying a message by clothing or any sort of paraphernalia that could prejudice the rights of the Commonwealth or a defendant. As the Ninth Circuit memorably opined, at least some of the "first amendment rights of trial attendees can and must be curtailed at the courthouse door."[27]

**D. *The Trial Court's Extraneous Comments Do Not Rise to the Level of Palpable Error.***

■ Although conceding the issue is unpreserved for review, Allen contends the trial court's numerous gratuitous comments to the jury deprived him of his right to a fair trial. More specifically, the trial court once stated that it was overruling the Commonwealth's objection to Allen's counsel's questioning of a witness "for whatever it is worth" and, similarly, another time sustained Allen's counsel's hearsay objection to the Commonwealth's questioning of a police officer "for what it's worth." Also, in response to a juror's inquiry as to whether the juror could question a wit-

an unacceptable threat to the defendant's right to a fair trial.").

**24.** 230 S.W.3d at 576.

**25.** *See, e.g., Speed,* 961 P.2d at 29–30 ("in the administration of justice, the trial judge is charged with the preservation of order in his or her court with the duty to see that justice is not obstructed by any person or persons whatsoever.").

**26.** *People v. Pennisi,* 149 Misc.2d 36, 563 N.Y.S.2d 612, 615 (1990).

**27.** *Norris v. Risley,* 918 F.2d 828, 832 (9th Cir.1990). *See also Carey,* 549 U.S. at 79, 127 S.Ct. at 656 (Stevens, J., concurring) ("In my opinion, there is no merit whatsoever to the suggestion that the First Amendment may

provide some measure of protection to spectators in a courtroom who engage in actual or symbolic speech to express any point of view about an ongoing proceeding."); *Pennisi,* 563 N.Y.S.2d at 614–15 ("This court rejects any premise that people who want to communicate protests, views or feelings of any kind or nature, for or against any person, issue or cause, have a constitutional right to do so within the confines of a public courtroom. Such matters must be communicated through an evidentiary way at trial or hearing or other court sessions pursuant to prescribed rules of courtroom procedure and/or decorum.

We must remind ourselves that a courtroom is committed to being a neutral environment-a holy shrine of impartiality in its resolutions of differences, and a place dedi-

ness, the trial court responded that the Commonwealth did not oppose such questioning but Allen's counsel did. Finally, when Allen's counsel was attempting to impeach a witness by inquiring into three allegedly different statements the witness gave to the police, the Commonwealth objected and stated that Allen's counsel should get the video of the statements. The trial court agreed, adding within the jury's hearing that the statements were "all substantially the same...." We agree with Allen that the trial court's comments were unnecessary but disagree with Allen's contentions that these extraneous statements were so egregious as to constitute palpable error.

 Ideally, trial courts should rule upon objections without adding gratuitous comments. As our predecessor court noted, a "trial judge should remember that undue importance and great weight may be attached by the members of the jury to any remark made by [the trial judge] in their presence. This is due to the confidence in and esteem for a judge and respect for his position." [28] However, "[n]ot every utterance of doubtful propriety made by the court during the course of the trial results in prejudice....' " [29] So we must determine if the trial court's extraneous remarks actually prejudiced Allen.

Our predecessor court confronted a similar issue in *Preston.* In *Preston,* the trial court remarked in the course of overruling an objection, "1 will permit that, but it is a little off, and I can't see how it has much

bearing....' " [30] On appeal, our predecessor court held the remark (and other similar remarks) to have been "unnecessary" but not prejudicial.[31] We similarly find the "for what it's worth" comments to have been unnecessary, but we are not persuaded that the remarks were so egregious and trial-altering as to constitute palpable error.

Similarly, we find no palpable error in the trial court informing the jury that Allen's counsel objected to jurors questioning a witness but the Commonwealth did not. It was completely unnecessary for the trial court to inform the jury about whether any party objected to the jurors being able to question a witness. Of course, the decision of whether to permit juror questioning of witnesses is completely within the trial court's discretion.[32] Far better practice would have been for the parties to have made their objections, if any, to juror questioning on the record during a bench conference or recess. But we fail to perceive how the trial court's ill-advised statement was so egregious as to be "shocking or jurisprudentially intolerable." [33] So we decline to find the statement in question to be palpable error.[34]

Finally, we find no palpable error in the trial court's comment that all three of the witness statements in question were "all substantially about the same, there may be a few words left off...." These statements referred to what the witness allegedly heard Allen say after he shot Brown. Those three statements allegedly made by

---

cated to fairness and equal treatment under law....").

**28.** *Collins v. Sparks,* 310 S.W.2d 45, 47 (Ky. 1958).

**29.** *Preston v. Commonwealth,* 406 S.W.2d 398, 405 (Ky.1966) (*quoting State v. Ross,* 371 S.W.2d 224, 228 (Mo.1963)).

**30.** *Id.*

**31.** *Id.*

**32.** Kentucky Rules of Evidence (KRE) 614(c).

**33.** *Martin,* 207 S.W.3d at 4.

**34.** The trial court ultimately asked the question to the witness on behalf of the juror. No objection to that decision has been raised as an issue on appeal.

Allen were: "I meant to"; "I meant to kill him"; and "I meant to kill you, you son of a bitch." The Commonwealth objected to the attempted impeachment, arguing that the defense should just play the tape of the witness's statement to the police. The trial court agreed, stating that "it's all substantially about the same, there may be a few words left off...."

Although there obviously were some minor word variations and additions among the three statements, we conclude the trial court's comment that the three statements were substantially the same was correct: all three statements conveyed the unmistakable impression that Allen intended to shoot Brown. In order to avoid any appearance of the trial court commenting on the evidence, the trial court likely should have refrained from commenting within the jury's hearing that the statements were all about the same;[35] but the remark was not so out of bounds and jurisprudentially intolerable as to rise to the level of palpable error.

In sum, we hold that the comments in question, though largely improper, did not individually or collectively rise to the level of palpable error.

### E. No Improper Bolstering Occurred.

Brown's uncle, who was the first person on the scene after Brown had been shot, testified that he heard Allen state to Brown, "I meant to kill you, you son of a bitch." During his testimony, Brown's uncle stated that he had recently gotten back into church and was reading the Bible before Brown was shot. Moreover, the uncle testified that after the shooting, he had "witnessed" (i.e., expressed his religious faith) to Brown. Another witness testified both that Brown's uncle had been reading the Bible before the shooting and that she (the witness) was telling the truth because she was trying to live through the Lord. Allen contends this testimony was improper bolstering because the law requires that evidence of a witness's good character should not be introduced until after the witness's character has been attacked.[36] Allen admits this issue is unpreserved for appellate review.

We question whether the references to Brown's uncle's reading of the Bible before the shooting were actually premature character evidence. It appears that the statements referring to reading the Bible were mere attempts to establish a factual predicate or foundation for the witness's whereabouts and activity immediately before the shooting, especially since the information about the Bible was not intentionally elicited by the Commonwealth.[37] But even if we assume, solely for the purposes of argument, that the references to reading the Bible were improper character bolstering, any error would not be palpable because there is no reasonable probability that the testimony altered the verdict.[38] Likewise, we conclude that the reference to the uncle "witnessing" to Brown after the shooting was primarily aimed at factually establishing what the uncle and Brown

---

**35.** The attorneys and trial court dealt with many objections in open court in full hearing of the jury. Many of the issues in this case would have been eliminated if all objections had been stated and explained, responded to, and ruled upon at the bench out of the jury's earshot.

**36.** See, e.g., Harp v. Commonwealth, 266 S.W.3d 813, 824 (Ky.2008).

**37.** Originally, the uncle merely testified generally that he had been reading, to which (after a short digression) the Commonwealth asked, "you had been reading and concentrating on that?" The uncle's response to that question included the non-responsive fact that he had been reading the Bible.

**38.** Martin, 207 S.W.3d at 3.

did after the shooting. Indeed, the question that led to the witness's response was simply what the uncle did with Brown once the uncle took Brown inside after the shooting. However, even if we assume that the testimony about witnessing was improper bolstering, that error was not so egregious as to rise to the level of palpable error. After all, if the jury had accepted Brown's uncle's testimony at face value, it would have convicted Allen of intentional, not wanton, murder since the uncle testified that he heard Allen state that he had intended to kill Brown.

 Likewise, the statement of another witness that she was trying to live for the Lord was not a palpable error. Allen's counsel asked on cross-examination whether the witness heard only one shot, to which the witness gave a long, rambling, largely non-responsive and tearful answer in which she explained that she was testifying truthfully; but, in prior statements, she may have used different words than she used during trial. Included within that lengthy, non-responsive answer to a simple question was the witness's statement that she loved both Allen and Brown and that she did not want to hurt anyone and would tell the truth because she was living for the Lord. Eventually, the Commonwealth—not defense counsel—objected; and the trial court sustained the objection, reminding the witness to respond to the questions asked. Taken in context, the stray remark about living for the Lord, although completely irrelevant and non-responsive, was not so egregious and trial-altering as to constitute a palpable error, especially because the trial court properly sustained the Commonwealth's objection.

### III. CONCLUSION.

For the foregoing reasons, we affirm the trial court's judgment of conviction and sentence.

All sitting. All concur.